Richard L. Hertzberg, Esq.
**GREENBAUM, ROWE, SMITH & DAVIS LLP**
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, New Jersey 07095-0988
732-549-5600
Attorneys for Defendant,
Empire Auto Parts, Inc.

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JASON REED,<br><br>                    Plaintiff,<br><br>v.<br><br>EMPIRE AUTO PARTS, INC.,<br><br>                    Defendant. | **Case No. 1:13-CV-05220-RMB-AMD** |

### DECLARATION OF RICHARD L. HERTZBERG, ESQ.

RICHARD L. HERTZBERG, ESQ., pursuant to 28 U.S.C. §1746, declares as follows:

1.   I am an attorney-at-law of the State of New Jersey and am admitted to practice before this Court.  I am a partner with the law firm of Greenbaum, Rowe, Smith & Davis LLP, attorneys for defendant Empire Auto Parts, Inc. ("Empire").  As such, I have knowledge of the facts set forth below.

2.   Attached as Exhibit A is a copy of the July 17, 2014 Deposition Transcript for plaintiff Jason Reed.

3121836.2

3.   Attached as Exhibit B is a copy of the unpublished opinion Armstrong v. Weichert Realtors, 2006 U.S. Dist. LEXIS 31351 (D.N.J. May 19, 2006).

4.   Attached as Exhibit C is a copy of the unpublished opinion Banks v. Radioshack Corp., 2014 U.S. Dist. LEXIS 60794 (E.D. Pa. April 25, 2014).

5.   Attached as Exhibit D is a copy of the unpublished opinion Cason v. Vibra Healthcare, 2011 U.S. Dist. LEXIS 47160 (E.D. Mich. May 3, 2011).

6.   Attached as Exhibit E is a copy of the unpublished opinion Dreyer v. Altchem Environmental Services, Inc., 2007 U.S. Dist. LEXIS 71048 (D.N.J. September 25, 2007).

7.   Attached as Exhibit F is a copy of the unpublished opinion Evancho v. Sanofi-Aventis U.S. Inc., 2007 U.S. Dist. LEXIS 93215 (D.N.J. December 19, 2007).

8.   Attached as Exhibit G is a copy of the unpublished opinion Frye v. Baptist Memorial Hospital, 2010 U.S. Dist. LEXIS 101996 (W.D. Tenn. September 27, 2010).

9.   Attached as Exhibit H is a copy of the unpublished opinion Guenzel v. Mount Olive Bd. Of Educ., 2011 U.S. Dist. LEXIS 132102 (D.N.J. November 16, 2011).

10.  Attached as Exhibit I is a copy of the unpublished opinion Hall v. Guardsmark, LLC, 2012 U.S. Dist. LEXIS 116129 (W.D.Pa. August 17, 2012).

11.   Attached as Exhibit J is a copy of the unpublished opinion Kronick v. Bebe Stores, Inc., 2008 U.S. Dist. LEXIS 78502 (D.N.J. October 2, 2008).

12.   Attached as Exhibit K is a copy of the unpublished opinion Pomareda v. Homebridge Mortgage Bankers Corp., 2007 U.S. Dist. Lexis 12572 (S.D. Fla. February 22, 2007).

13.   Attached as Exhibit L is a copy of the unpublished opinion Postiglione v. Crossmark, Inc., 2012 U.S. Dist. LEXIS 163615 (E.D. Pa. November 14, 2012).

14.   Attached as Exhibit M is a copy of the unpublished opinion Rogers v. Ocean Cable Group, Inc., 2011 U.S. Dist. LEXIS 149197 (D.N.J. December 29, 2011).

15.   Attached as Exhibit N is a copy of the unpublished opinion Smith v. Sovereign Bank Corp., Inc., 2003 U.S. Dist. Lexis 21010 (E.D. Pa. November 13, 2003).

16.   Attached as Exhibit O is a copy of the unpublished opinion Verdecchio v. Tri-County Real Estate Maintenance Company, Inc., 2012 U.S. Dist. LEXIS 179337 (D.N.J. December 19, 2012).

17.   Attached as Exhibit P is a copy of the unpublished opinion West v. Border Foods, Inc., 2006 U.S. Dist. LEXIS 96963 (D. Minn. June 12, 2006).

18.   Attached as Exhibit Q is a copy of the unpublished opinion <u>Williams v. Accredited Home Lenders</u>, 2006 U.S. Dist. LEXIS 50653 (N.D. Ga. July 25, 2006).

I declare under penalty of perjury that the foregoing is true and correct.

s/Richard L. Hertzberg
RICHARD L. HERTZBERG, ESQ.

Executed on: October 6, 2014

3121836.2

# EXHIBIT  A

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

CASE NUMBER: 1:13-CV-05220-RMB-AMD


- - -

JASON REED,                          :

                 Plaintiff,:

    vs.                              :

EMPIRE AUTO PARTS, INC.,      :

ET AL.,                              :

                 Defendants.:

- - -

July 17, 2014

- - -

Deposition of JASON REED, taken pursuant to notice, was held at the LAW OFFICES OF GREEMBAUM, ROWE, SMITH & DAVIS, LLP., Metro Corporate Campus One, 99 Wood Avenue South, 5th Floor, Iselin, New Jersey 08830 commencing at 10:30 a.m., on the above date, before Catherine Golembeski, a Certified Court Reporter and Registered Professional Reporter and Notary Public in and for the State of New Jersey.


MAGNA LEGAL SERVICES

(866) 624-6221

www.MagnaLS.com



Page 2

```
1   APPEARANCES:
2
3   SWARTZ SWIDLER, LLC
    BY:  MATTHEW D. MILLER, ESQ.
    1878 Marlton Pike East
4   Society Hill Office Park, Suite 10
    Cherry Hill, New Jersey 08003
5   (856) 685-7420
    Representing the Plaintiff
6
7
8   GREENBAUM, ROWE, SMITH & DAVIS, LLP.
    BY:  RICHARD HERTZBERG, ESQ.
9   Metro Corporate Campus One
    99 Wood Avenue South, 5th Floor
10  Iselin, New Jersey 08830
    (732) 549-5600
11  Representing the Defendant
12
13  ALSO PRESENT:
14  Steve Moskal
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1                - - -
2   DEPOSITION SUPPORT INDEX
3                - - -
4   Direction to Witness Not to Answer
5   Page Line    Page Line    Page Line
6   None
7
8   Request for Production of Documents
9   Page Line    Page Line    Page Line
10  None
11
12  Stipulations
13  Page Line    Page Line    Page Line
14  None
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1                - - -
                 I N D E X
2                - - -
3   Testimony of: JASON REED
4   By:  MR. HERTZBERG                5
5
6                - - -
             E X H I B I T S
7
8   NO.     DESCRIPTION          PAGE

9   JR-1    Summons              18

10  JR-2    Defendant Empire Auto Parts, Inc.'s
            Initial Interrogatories to Jason Reed
            and Plaintiff's Responses to Defendant's
11          First Set of Interrogatories     25
12  JR-3    Empire Auto Park Employee Handbook   29
13  JR-4    Employee Written Warning Notice 1/31/11  64
14  JR-5    Employee Written Warning Notice 6/30/11  66
15  JR-6    Employee Written Warning Notice 12/8/11  72
16  JR-7    Employee Written Warning Notice 5/22/12  73
17  JR-8    E-mail Thread        74
18  JR-9    Employee Written Warning Notice 10/3/12  76
19  JR-10   Employee Written Warning Notice 11/29/12  77
20  JR-11   Driver Notice and Exchange Report    82
21  JR-12   Check View-Rollup Totals     90
22  JR-13   Timecard Report with Notes   97
23
24
25
```

Page 5

```
1                - - -
2   (It is hereby stipulated and agreed by
3   and between among counsel that signing,
4   sealing, filing and certification are
5   waived; and that all objections, except
6   as to the form of the question, will be
7   reserved until the time of trial.)
8                - - -
9   JASON REED, after having been duly sworn,
10  was examined and testified as follows:
11
12            EXAMINATION
13               - - -
14  BY MR. HERTZBERG:
15    Q.  Mr. Reed, good morning.
16    A.  Morning.
17    Q.  My name is Richard Hertzberg.  We just
18  met.  And I represent the Defendant in this matter,
19  and we're here today to take your deposition.
20    A.  Okay.
21    Q.  Have you been deposed before?
22    A.  No.
23    Q.  Okay.  Let me tell you about what we're
24  doing here.  This is an interview session under
25  oath.  So even though it's in an informal setting,
```



Page 6

1    you've got to consider it as if we were in court.
2        A.   Right.
3        Q.   Therefore, I want to make sure you
4    understand my questions before you answer them.  So
5    if there's any doubt in your mind as to what I'm
6    asking; please stop me, and let me know there's an
7    issue and I'll try to rephrase and explain what I'm
8    asking you.
9        A.   Okay.
10       Q.   I see you're nodding your head a little
11   bit.  It's difficult for the court reporter, if not
12   impossible, for her to take down nods, shrugs.
13       A.   Right.
14       Q.   So to the extent you can, try to
15   remember to answer verbally.
16            In terms of our back and forth, what's
17   going to happen, where I'm going to speak over you
18   or you're going to speak over me, let's try to keep
19   that to a minimum, because, again, the court
20   reporter will have trouble following who said what
21   and it makes for a very choppy record.
22       A.   Okay.
23       Q.   Because a book is going to be generated
24   from this event, and it will be a transcript book
25   that can be referred to at trial in this matter, I

Page 7

1    don't want you to guess.  If you don't know an
2    answer, that's perfectly fine.  Just say, I don't
3    know.  If you're giving an estimation or a ball
4    park answer, that's fine too, just let me know that
5    you're doing that.
6        A.   Okay.
7        Q.   You don't have to know an exact date,
8    but around this time, sometime this year is fine.
9        A.   Okay.
10       Q.   If you need to take a break, we'll take
11   one, just let me know.  It's not anyone's intention
12   here to put you through the ringer.  There may be
13   times when your attorney may interpose an
14   objection.  And, generally, these objections are
15   going to be of a formal nature to preserve the
16   record and he'll allow you to answer.
17       A.   Okay.
18       Q.   There may be objections regarding
19   privilege, in which event you should seek your
20   counsel's guidance as to whether or not you're
21   going to answer the question.
22       A.   Okay.
23       Q.   Okay.  Do you have any questions before
24   we get going?
25       A.   No.

Page 8

1        Q.   Okay.  What's your birth date?
2        A.   December 7th, 1981.
3        Q.   Okay.  Are you a high school graduate?
4        A.   Yes.
5        Q.   Where did you graduate from?
6        A.   Delran High School.
7        Q.   Did you have any further education?
8        A.   No.
9        Q.   And when did you graduate from high
10   school?
11       A.   June of 2000.
12       Q.   And did you take a job immediately upon
13   leaving high school?
14       A.   Yes.
15       Q.   What job did you take?
16       A.   Trailer mechanic helper, obviously, not
17   full blown.
18       Q.   Right.  What was the name of that
19   company?
20       A.   Alert Motor Freight, Incorporated.
21       Q.   How long were you there?
22       A.   About a year.
23       Q.   And after that, where did you work?
24       A.   Billows Electric Supply.
25       Q.   B-e-l-l-o-w-s?

Page 9

1        A.   B-i-l-l-o-w-s.
2        Q.   Okay.  What did you do there?
3        A.   Warehouse.
4        Q.   And why did you leave the work?
5        A.   Not a significant increase in pay
6    raises.  I went from close to full-time in high
7    school and then full-time after I graduated with no
8    raise.
9        Q.   Okay.  You had a raise at Billows?
10       A.   An increase in pay, yeah.
11       Q.   What were you doing at Billows?  What
12   kind of work?
13       A.   Forklift, stocking shelves, pulling
14   orders, basic warehousing.
15       Q.   How long were you there?
16       A.   Probably about the same amount of time.
17       Q.   And another year?
18       A.   2000, 2001.
19       Q.   All right.  How long were you at
20   Billows?
21       A.   For about a year.
22       Q.   And where did you go after that?
23       A.   In construction.
24       Q.   And why did you leave Billows?
25       A.   More money in construction.



Page 10

1    Q.  Okay.  And what was the outfit of the
2  construction?
3    A.  That I can't remember that first one.
4  There was quite a few construction companies.
5    Q.  Okay.  After that were you with a
6  series of construction companies?
7    A.  Three or four of them maybe.
8    Q.  Okay.  One after the other?
9    A.  Pretty much, yeah and some back and
10  forth with.
11    Q.  Okay.  Over the course of how many
12  years would you estimate you worked in
13  construction?
14    A.  Pretty much I would say 10 years plus.
15    Q.  Okay.  And what type of construction
16  jobs did you do, generally?
17    A.  Generally, like, basic home
18  construction, demolition, framing, drywall,
19  painting, spackling, installing electrical
20  fixtures, plumbing, you know, basics of building a
21  house pretty much.
22    Q.  You're pretty much a Jack-of-All
23  Trades?
24    A.  I wouldn't say that.  I don't have full
25  knowledge of some of the areas, but.

Page 11

1    Q.  Did you focus on any particular area?
2    A.  I'm sorry?
3    Q.  Did you focus on a particular area of
4  construction or just all these different things?
5    A.  It was mainly different things.  I
6  would say I did more of the demolition and then
7  drywall and spackling and painting, more than other
8  parts of it, but.
9    Q.  Okay.  So you think you left
10  construction around what, 2010?
11    A.  Yeah, something like that.
12    Q.  Okay.  And why did you leave
13  construction?
14    A.  I was -- just work slowed up.  I don't
15  know if it was the economy or what, but full-time
16  construction kind of disappeared.
17    Q.  Were you let go from an outfit?
18    A.  No, I was laid off.
19    Q.  Do you remember the name of the company
20  that laid you off?
21    A.  New Age New Phase Construction.
22    Q.  Do you know where they're located?
23    A.  Riverside, New Jersey.
24    Q.  And do you remember who your supervisor
25  was at that time?

Page 12

1    A.  Yes, Gary Dubell.
2    Q.  Could you spell his last name?
3    A.  D-u-b-e-l-l.
4    Q.  Have you kept in touch with him?
5    A.  Yes, he's a friend of mine.
6    Q.  Okay.  So when you left construction,
7  did you take a job?
8    A.  Yeah, Empire.
9    Q.  Okay.  Had you worked as a driver
10  before you were with Empire?
11    A.  Yeah, I've had driving jobs before,
12  yes.
13    Q.  What kind of driving jobs?
14    A.  I've delivered auto parts in the past,
15  not body parts with like Empire, but mechanical
16  parts, delivering of furniture and installing
17  furniture.  And I'd say most of the experience
18  delivering construction supplies and tools, like,
19  box and straight trucks, stuff like that.
20    Q.  And when did you do these driving jobs,
21  in between construction jobs?
22    A.  Yeah or with the construction company,
23  depending on what area I was needed in.
24    Q.  What kind of construction caused you to
25  deliver auto parts?

Page 13

1    A.  That was before the construction, the
2  phase of construction I was in.  And it was back in
3  -- I worked for Car Quest, I think part-time during
4  high school.
5    Q.  Okay.
6    A.  I can't remember the exact dates.
7    Q.  Do you remember any of the names of any
8  other companies that you did delivery jobs for?
9    A.  A&C Supply.  They're also in Riverside.
10  Again, I can't remember dates.  Sambe Construction
11  in Pennsauken.  I don't remember exact dates.  I've
12  driven for New Age New Phase.
13    Q.  I'm trying to understand where these
14  driving jobs fit in with the construction.  They
15  seem to be continuous between 2002 and 2010.  Were
16  you working two jobs or how did they fit?
17    A.  Well, like I said, I've been on and off
18  with mainly New Age New Phase probably since '05.
19  So whenever he didn't have work for me, I would,
20  you know, whatever job offered me full-time work, I
21  pretty much took so.
22    Q.  And when construction started up, you'd
23  leave the driving job and do construction?
24    A.  Yeah.  I mean, I was paid pretty well
25  by New Age New Phase, so if he had a contract that



Page 14

1   was going to last significant amount time, for
2   full-time hours, then I would go with him.
3        Q.   Okay.  Were you a full-time driver for
4   any of the companies you mentioned?
5        A.   Yeah.  A&C Supply and Sambe
6   Construction.  As far as the other companies, it
7   was part-time or driving was just something I did,
8   like, maybe per diem if they needed me to.  It
9   wasn't my title at work.
10       Q.   Right.  So, for example, at A&C Supply,
11  did you get a lunch?
12       A.   Yes.
13       Q.   Okay.  How long?
14       A.   I think it was a half hour.
15       Q.   Okay.  And where were you supposed to
16  take it?
17       A.   I didn't have a specific place to take
18  it.
19       Q.   Okay.  Did you take it?
20       A.   Sometimes yeah.  Sometimes no.
21  Depending on how busy I was.
22       Q.   Did anyone there tell you not to take
23  your lunch break?
24       A.   No.
25       Q.   Did anyone tell you that you should

Page 15

1   take your lunch break there?
2        A.   No.
3        Q.   How did you know you had a lunch break?
4        A.   Boss said I'm allowed a half hour
5   lunch.
6        Q.   Okay.  He never told you not to take
7   it?
8        A.   No.
9        Q.   Who was the boss there?
10       A.   Fred Lindsay.
11       Q.   How do you spell his last name?
12       A.   L-i-n-d-s-a-y.
13       Q.   Okay.  If you decided not to take a
14  lunch with A&C, would you report that to A&C that
15  you didn't take a lunch?
16       A.   Yeah.
17       Q.   Who would you report that to?
18       A.   Fred Lindsay.
19       Q.   And what did he say in response?
20       A.   He just suggested -- he just adjusted
21  my hours.
22       Q.   Did he pay you overtime?
23       A.   It -- when overtime was available,
24  yeah.  Wasn't that much.
25       Q.   Did he pay you overtime for the half

Page 16

1   hour that you didn't take a lunch?
2        A.   Yes.
3        Q.   And how big a company, ball park, was
4   A&C Supply?
5        A.   Not big at all, three or four
6   employees.  I was actually his first employee when
7   he started the company.
8        Q.   Okay.  And you left there for
9   construction work?
10       A.   Yeah, he slowed up about, I'd say,
11  probably around Octoberish when it starts getting
12  cold.  So I pretty much, you know, was laid off in
13  a sense.  I mean, I could have stayed working 20
14  hours a week, but couldn't really afford that, so
15  I'd gone to whatever was available full-time.
16       Q.   Okay.  Now, you were full-time with
17  Sambe Construction, correct?
18       A.   Yes.
19       Q.   And you did driving for them too?
20       A.   Yes.
21       Q.   Did you have a lunch with them?
22       A.   Yes.
23       Q.   How long was it?
24       A.   Half hour.
25       Q.   Okay.  How big of an outfit was Sambe?

Page 17

1        A.   They're pretty big.
2        Q.   Yeah.  Can you estimate how many
3   people?
4        A.   I would say, maybe, I don't know now.
5   I've heard they're bigger.  50 back when I was
6   working with them.
7        Q.   Okay.  And did you get a half hour
8   lunch break?
9        A.   Yes.
10       Q.   Were you advised there that you should
11  take your lunch break?
12       A.   Yes.
13       Q.   Did you always take your lunch break at
14  Sambe?
15       A.   Yes.
16       Q.   Why did you always take it with Sambe
17  but not with Lindsay?
18       A.   Most of the time I delivered parts or
19  supplies, rather, to construction sites, schools or
20  another big building that was commercial.  So after
21  unloading the truck, it would be around that time
22  and everybody else would take lunch, so I would
23  just, you know, I would take my lunch with
24  everybody else.
25       Q.   Okay.  Would there be a common place to

Page 18

1    take lunch?
2         A.   Yeah.
3         MR. HERTZBERG:  Let me mark this JR-1.
4         (Exhibit JR-1, Summons, was marked for
5         identification.)
6         Q.   Okay.  Please take a look at that and
7    let me know if you've seen any portion of JR-1
8    before today.  Take your time.
9         (Witness Complies.)
10        MR. MILLER:  Why don't you flip through
11   it.
12        Q.   Yeah, take your time to look through
13   it.
14        (Witness Complies.)
15        A.   This looks similar to the e-mail, I
16   guess.
17        MR. MILLER:  I can't help you.  If
18   you've seen it, let him know.
19        Q.   Do you remember seeing an e-mail
20   similar to that?
21        A.   Yeah, may have been in a sample.  I
22   mean, I can't actually say for sure, so.
23        Q.   You don't know one way or the other if
24   you saw this document?
25        A.   Right.  If it was this exact document,

Page 19

1    so.
2         Q.   Okay.  Do you remember seeing something
3    that had a caption?  And if you look through it,
4    there's a first page that has your name and then
5    Empire Auto Parts?
6         A.   Yes.
7         Q.   You've seen that so far?
8         A.   Yes.
9         Q.   But you don't know if you saw the rest
10   of this document.  Is that right?
11        A.   I've seen pretty much the rest of the
12   document for -- for this exact first page, I can't
13   necessarily say I've seen, so.
14        Q.   Okay.  So did you read this document
15   whenever you saw it last?
16        A.   I skimmed through it.  I read some of
17   it, but I didn't read the entire thing.
18        Q.   Do you remember when you first received
19   that document?
20        A.   It was maybe nine months ago, something
21   like that.  Somewhere around there.
22        Q.   Do you know if it was before or after
23   the suit was filed?
24        A.   No, that I don't.  I'm going to say it
25   was after.

Page 20

1         Q.   What makes you say that?
2         A.   Why would something like this be filled
3    out, if the suit wasn't filed.
4         Q.   So that's your best recollection?
5         A.   I have everything saved on my phone, so
6    I don't have my phone with me or I'd be able to
7    answer that right now.  But, yeah, pretty much.
8         Q.   When you say you have everything saved
9    on the phone, you have everything related on this
10   case on your phone?
11        A.   I don't really have any personal
12   computer, I view everything on my phone.
13   Anything that's important I save, so.
14        Q.   Did you save anything on your phone
15   regarding your time at Empire?
16        A.   Yeah.  I have a breakdown of, like, my
17   pay stubs and stuff like that.  And I always write
18   down my hire date and, you know, date that I leave
19   a company regardless of that.  So I pretty much
20   remember that part of it.
21        Q.   How about texts with Steve?
22        A.   I don't have that saved.  I can
23   remember some texts that I've exchanged with him,
24   not word-for-word, but around about.
25        Q.   So you think you have those texts?

Page 21

1         A.   No, they're not on my phone any longer,
2    no.
3         Q.   Okay.  Well, why is that?
4         A.   I didn't feel really a need or
5    importance to save them.
6         Q.   Okay.  So you deleted them?
7         A.   Yeah, or after so many texts it says
8    delete themselves, or after 30 or something, if I
9    don't save it.
10        Q.   Do you have any texts with any current
11   or former Empire employee?
12        A.   No.  Like texts on my own?
13        Q.   Yeah.
14        A.   No, not saved on my phone, no.
15        Q.   Did you have any texts, at any point,
16   with any present or former Empire employee?
17        A.   I think I have texted with, maybe, one
18   or two other people in the past during my
19   employment.  I don't think it had anything in
20   relation to do with this case.
21        Q.   Okay.  So if I understand correctly,
22   you never texted anyone at Empire or after you left
23   Empire?
24        A.   After I left Empire, yes, but I don't
25   think it had anything to do with this case.  I

**MAGNA**
**LEGAL SERVICES**

Page 22

1  can't really exactly remember, but there was a
2  former employer that we both shared an interest in
3  cars and working on cars, so I can say that I
4  texted that person more than other people, but.
5      Q.   This is an Empire employee?
6      A.   Former Empire employee.  He was let go
7  prior to me.
8      Q.   Okay.  What's his name?
9          THE WITNESS:  Do I have to answer that?
10         MR. MILLER:  Uh-huh.
11     A.   Jose Cologne.  I can't remember how to
12  spell his last name, but that's how he pronounced
13  it.
14     Q.   Have you talked to him at all about
15  this lawsuit?
16     A.   I've tried to contact him.  I haven't
17  really been successful in doing that.  So if I
18  verbally talked to him about it, no.
19     Q.   Well, have you texted him about it?
20     A.   I may have, but I can't really
21  remember.  And I probably didn't get into detail
22  about it.  It was more, I think, maybe a
23  questioning on if he had experienced anything of
24  the nature of, you know, what I was intending on
25  pursuing.

Page 23

1      Q.   Do you remember having some sort of
2  communication with him about that?
3      A.   No, I don't remember.
4      Q.   Do you know the amount of damages that
5  you personally are seeking in this case?
6      A.   I didn't fully go into my pay stubs and
7  every single day that I didn't take lunch, but I
8  would say, you know, I would say somewhere in the
9  range of, as far as, you know, what's owed to me,
10  you know, 7,000 plus.
11     Q.   Let's say between 7,000 and 10,000?
12     A.   I would say something like that, at
13  least.
14     Q.   Okay.  Well, if it's more than -- how
15  much more do you think that would be?
16     A.   I mean, as far as, you know, what is
17  owed?  I would say, I can't really see it being
18  more than 15.  15, I guess, to 17 or something.  I
19  can't see it.
20     Q.   That's the upper level, you imagine?
21     A.   Yeah.  I mean, you know.
22     Q.   If you received those monies that you
23  believe you're entitled to, would you continue this
24  case?
25     A.   Probably not.

Page 24

1      Q.   Now, you mention you read this
2  document, correct, JR-1?
3          Correct?
4      A.   I said I've skimmed through it.
5      Q.   That's true.
6      A.   Okay.
7      Q.   That's what you said, I apologize.
8          If you turn to page seven?
9      A.   Okay.
10     Q.   And paragraph 52?
11     A.   Okay.
12     Q.   Do you see that?  Do you remember
13  reading that?
14     A.   Somewhat, yes.
15     Q.   Well, is it something you think you
16  skimmed or something that you actually focused on?
17     A.   Well, I mean, I've already calculated
18  this in my head prior to reading anything of it,
19  but, you know, that would be, you know, if I didn't
20  take the lunch times five days a week.  You know, I
21  really -- anything over 40 hours would be overtime.
22  So I don't think there was more than maybe one or
23  two weeks where I didn't have overtime in this
24  company at Empire, so.
25     Q.   So you think you routinely worked

Page 25

1  between 45 and 50 hours a week?
2      A.   Yeah, maybe closer to the 45 end of it,
3  but yeah.
4      Q.   Okay.  Were you paid overtime at
5  Empire?
6      A.   Yeah.
7      Q.   So you're just suing about times that
8  you didn't take lunch.  Is that right?
9      A.   Right.
10         MR. HERTZBERG:  Let's mark this as
11  JR-2.  It's Defendant's Interrogatory Questions to
12  Jason Reed and Mr. Reed's responses to those
13  questions.  We'll mark them as one document so
14  we'll refer back and forth, please.
15         (Exhibit JR-2, Interrogatory Questions
16          and Interrogatory Responses, were
17          marked for identification.)
18     Q.   So please take a look at the documents
19  that comprise JR-2, and let me know if you've seen
20  either of these documents before.
21         (Witness complies.)
22     Q.   There's two separate documents there,
23  so take your time.
24     A.   This one I already know I received and
25  read.

Page 26

1   Q. Okay. You're looking at Defendant,
2   Empire Auto Parts, Inc.'s Initial Interrogatories
3   to Jason Reed?
4   A. Okay.
5   Q. That's the one you're referring to that
6   you know you saw?
7   A. Yes.
8   Q. Okay. And so please take some time to
9   look at the second document that's part of the
10  exhibit. Have you seen that before today?
11  A. I remember answering these. I didn't
12  read through the actual paperwork of my responses,
13  like it says on paper, but I remember answering
14  these questions and seems like it's...
15  Q. When you say you remember answering
16  these questions, these answers were written down by
17  you?
18  A. No.
19  Q. Just reported them to your attorney?
20  A. Yes.
21  Q. So although you didn't see Plaintiff's
22  Responses to Defendant's First Set of
23  Interrogatories, you believe that they accurately
24  reflect your answers to the questions that you saw.
25  Is that right?

Page 27

1   A. For the most case, yes.
2   Q. Is there any part that you feel doesn't
3   reflect your answers?
4   A. No.
5   Q. Okay. So, at the end of the first
6   document, there's a page that says certification?
7   A. JR-1?
8   Q. Number one as part of JR-2.
9   MR. MILLER: JR-2, last page.
10  MR. HERTZBERG: Right.
11  Q. So take a look at that. And after
12  reading it, let me know if you're comfortable
13  signing at the bottom.
14  (Witness Complies.)
15  A. As far as what's on paper in here as
16  far as my responses go, either now or whenever you
17  say it's okay with you, I'm going to have to read
18  this whole thing, as far as my responses go before
19  I sign this paper. So that's, basically, what it's
20  saying, as if I'm okay with the -- what the
21  responses are. So now it's in front of me on
22  paper, you know. I have to make sure that, you
23  know, they are accurate. I don't want to be held
24  in contempt of court for something I didn't even
25  read. Yes.

Page 28

1   Q. Okay. So just so I understand, as
2   you're sitting here today, you haven't read
3   Plaintiff's Responses to Defendant's First Set of
4   Interrogatories?
5   A. No.
6   Q. What I'm saying is correct?
7   A. Yes. What you're saying is correct, I
8   have not read them.
9   Q. Okay. But you believe you saw the
10  document that has the sicker on it. Is that right?
11  A. Yes.
12  Q. Okay. Did you ever look at a handbook
13  from Empire Auto?
14  A. No. I signed a paper when I was first
15  employed that was handed to me by Martha, her last
16  name is Milligan, I think. I could be mistaken,
17  but I think it's. And it had, like, a breakdown of
18  things required; like, you know, starting
19  employment, and the handbook was one of them. And
20  she said that they didn't have any made up and that
21  I would receive one, but to check it off anyway
22  just so they could file the paper. So that's what
23  I did. And I never received the handbook.
24  Q. Okay. Just so I understand. You
25  indicated that you would -- that you had received

Page 29

1   the handbook, because we're told that you would
2   receive a handbook. Is that right?
3   A. Correct.
4   Q. Okay.
5   A. I mean, I didn't write that down, like,
6   that it was just a check. Everything was a check
7   box down a list. So I just checked it off.
8   Q. Okay.
9   MR. HERTZBERG: Can you mark this JR-3,
10  please.
11  (Exhibit JR-3, Employee Handbook, was
12  marked for identification.)
13  Q. Please take a look at that and let me
14  know if you've seen that before today.
15  A. No, I can't say I've seen this entire
16  book pieced together like this. I've seen bits and
17  pieces of it. Maybe that was photocopied and
18  presented to me, but I've never seen this put
19  together like this. I can vaguely remember certain
20  bits and pieces of it that may have been
21  photocopied and shown to me, as far as, you know,
22  like the resting meal period, breaks. I think I
23  was shown on the computer. I can't remember who at
24  the Simmons location, when I was rear-ended on the
25  Turnpike, about the at-fault accident policy. So

Page 30

1  I've seen pages of this, but not the whole handbook
2  itself put together, if this is the handbook.
3      Q.  When do you think, if you can estimate,
4  you saw the page reflecting a rest and meal
5  practices?
6      A.  I think during the first write-up of
7  stopping at my mother's house, or I think at the
8  time it was my house also, about -- I said, you
9  know, argued the fact of, you know, where and when
10  about taking breaks.  So I think it was -- this was
11  brought up because they said to take breaks pretty
12  much, but on a sense of most drivers pack their own
13  lunch.  So it was kind of seemed like, you know,
14  that was the only way to be able to take a lunch
15  without getting written up.  So to say or, you
16  know, to have it covered on their end.  I don't
17  really now how else to explain it.
18      Q.  Okay.
19      A.  It was, you know...
20      Q.  Do you remember seeing page 16 where it
21  says administrative pay corrections?
22      A.  No.
23      Q.  Okay.  Back on 14, which you indicate
24  that you were shown.  You see, under timekeeping,
25  it says: "Accurately recording time worked is the

Page 31

1  responsibility of every non-exempt employee."  Do
2  you see that?
3      A.  Yes.
4      Q.  Okay.  Did you keep track of your time?
5      A.  Yeah.  We had to sign in on an ADP
6  website, clock in and out.
7      Q.  And you did that accurately?
8      A.  Yes.
9      Q.  Okay.  So what if you skip lunch, how
10  would you reflect that in your timekeeping, if at
11  all?
12      A.  Well, the first time I skipped lunch I
13  called in about it and was told that we have to
14  take our lunch.  You're given 30 minutes for lunch.
15  So, preferably, use it in between your first and
16  second run.  Sometimes, which a lot of cases was
17  kind of impossible if I'm going to get back at a
18  reasonable time to do my afternoon route.
19      Q.  Okay.  When you called up and advised
20  that you had skipped lunch, who did you call?
21      A.  I spoke with Steve.
22      Q.  Okay.  Steve Moskal?
23      A.  Yes.
24      Q.  Did you tell him, at that time, that
25  it's impossible to take a 30-minute lunch break?

Page 32

1      A.  Basically, yeah.
2      Q.  And what do you remember him saying?
3      A.  That take your lunch on your way back
4  in from your first route.
5      Q.  What do you remember saying?
6      A.  I pretty much didn't argue it past that
7  point.  I mean, I've tried to argue this with them
8  before and it doesn't seem, like, it gets anywhere.
9      Q.  In your view, what's the problem with
10  taking your half hour lunch in the course of your
11  first route?
12      A.  If I run into any delays, my route was
13  pretty busy.  It was either, you know, a lot of
14  stops in Philly or it was just, as far as I
15  traveled to get back in time.  So if I was to take
16  a 30-minute lunch, I'm going to be getting back at
17  a later time, and therefore, less deliveries in the
18  afternoon that I wouldn't probably be able to make
19  on time before a customer closed or, you know,
20  whatever of that nature.
21      Q.  In that conversation, did Mr. Moskal
22  ever tell you that you would not be paid overtime
23  if you didn't take a lunch?
24      A.  Not necessarily, no.  It was just
25  stressed to take the lunch on the way back in.

Page 33

1      Q.  And when you say not necessarily, do
2  you remember him saying that you weren't going to
3  get paid overtime if you didn't take your lunch?
4      A.  Not getting paid overtime?
5      Q.  Right.
6      A.  No, that wasn't...
7      Q.  It's your position, sitting here today,
8  that you're owed overtime for having to work
9  through lunch.  Is that right?
10      A.  Not necessarily.  It's just it was as
11  many hours that I worked during the week.  If it's,
12  you know, already at 40 and I didn't work through
13  the lunch, then, obviously, that would be in the
14  overtime factor.
15      Q.  Well, that's what you're saying
16  happened, right?
17      A.  I guess, yeah.
18      Q.  Okay.  Now, are you saying you never
19  took a lunch?
20      A.  No.
21      Q.  Okay.  When you took your lunch breaks,
22  where did you take them?
23      A.  Mainly I would attempt to take them at
24  my house, which is less than two miles away from
25  the shop.  And you can tell by the Geotab that it

MAGNA
LEGAL SERVICES

Page 34

1    was never a whole 30 minutes.
2        Q.  Was that your choice to cut it short?
3        A.  Yeah, because the first time I came
4    close to taking a whole lunch I was given a verbal
5    warning, so.
6        Q.  Who gave you a verbal warning?
7        A.  Jeffrey Bealer.
8        Q.  And what did he say?
9        A.  It was pretty much renamed into an
10   unauthorized stop, and that most drivers bring a
11   cooler with them.  That was said dozens of times to
12   me.
13       Q.  Was that true, most drivers brought a
14   cooler?
15       A.  Yeah, 75 percent of them did.
16       Q.  Okay.  Do you know whether the other 25
17   percent who didn't bring a cooler were ever written
18   up for violating the lunch policy?
19       A.  I mean, I can't answer for them, but I
20   mean, I think Jose Cologne may have been written up
21   for spending too much time at a certain stop that
22   he said claimed was taking his lunch.  But, again,
23   it was, you know, according to what he said, less
24   than 30 minutes.  It might have been between 20 and
25   30, but at a particular area that, obviously, they

Page 35

1    didn't like.
2        Q.  Did he tell you that?
3        A.  He, basically, complained about it
4    after a closed door quick meeting, like, a broad,
5    like, for any of the fellow drivers to hear about
6    it.  It wasn't necessarily spoken to me personally
7    or anybody else that we worked with personally.  So
8    it was just, like, you know, spoke his opinion
9    about the meeting.
10       Q.  Do you remember when that happened?
11       A.  No, not exactly.  Half a year before I
12   was terminated maybe.
13       Q.  Anyone else tell you that they've had
14   problems with the meal policy?
15       A.  No, I don't know of anybody else,
16   really.  I guess nobody else really minded, you
17   know, getting docked a half an hour and not using
18   it, I guess.  Like I said, I can't answer for other
19   people.
20       Q.  Do you know if other people were
21   docked?
22       A.  Well, I mean the whole company is
23   docked a half an hour for lunch that we were, you
24   know, supposedly entitled to.
25       Q.  I guess what I'm asking is:  Do you

Page 36

1    know whether everybody else didn't take their half
2    hour lunch?
3        A.  No, I don't know that or not.
4        Q.  Okay.
5        A.  I just don't see if you bring a cooler
6    with you and you pull over to the side of the road,
7    whether it's McDonald's or my house, it's the same
8    distance away for a set period of time.  What
9    difference that makes, if it's the time that I'm at
10   a certain location that I was being disciplined
11   for.  So I can't see that being any different by
12   walking in the door with a cooler.
13       Q.  So, again, you're talking about your
14   own situation that you felt you were sort of
15   treated differently because it was your home?
16       A.  No.  I'll just state that that was --
17   it didn't matter if it was at home or just a
18   location in general that I spent too much time
19   with.  After a while they said I wasn't allowed to
20   stop at home, so.
21       Q.  All right.  Are you finished?  Did you
22   feel like you were being singled out?
23       A.  Somewhat, yeah.
24       Q.  Did you ever feel like you had a
25   personality conflict with Mr. Bealer?

Page 37

1        A.  Maybe once or twice, but on a general
2    basis no, not towards -- not for -- towards the end
3    maybe, yeah, but not the whole time I was employed,
4    no.
5        Q.  Right.  And you mentioned you called
6    Mr. Moskal and let him know that you worked through
7    lunch.  Do you recall that?
8        A.  Yes.
9        Q.  And that was relatively early in your
10   employment with Empire?
11       A.  Yeah.  I'd say, like, again, halfway
12   through, at least, or sooner.  It wasn't really
13   that long.
14       Q.  Okay.  Now, how frequently would you
15   say you stopped off at your mom's house to take
16   lunch?
17       A.  I would stop there on the way back, on
18   the afternoon route to grab a quick bite to eat.
19   Maybe one or two days a week, something like that,
20   until I was, you know, disciplined for it.  And it
21   was, you know, I mean, the times were all recorded.
22   It wasn't nowhere near a lunch break length of
23   time.  So that was the time I just grabbed whatever
24   it was and got back in the truck and drove to work,
25   drove back to the shop.



Page 38

1    Q.  Now, were there any times that you, in
2  fact, reported to Mr. Moskal that you had worked
3  through lunch other than that first time?
4    A.  Not that I can remember, no.
5    Q.  Are you certain it never happened or
6  you just don't have a recollection of whether it
7  did or didn't?
8    A.  I just don't have a recollection.
9    Q.  Why did you call Mr. Moskal that first
10  time that you wanted to tell him that you didn't
11  take lunch?
12    A.  I think it was after the first time I
13  was verbally aware or warned about stopping to take
14  the lunch, so.  I mean, if I'm not going to be able
15  to stop and rest from driving, then I'm not going
16  to, you know, I'm not going to take a lunch.  And I
17  wanted to have my hours corrected or not to be
18  docked for the 30 minutes.
19    Q.  How did you know to call Mr. Moskal?
20    A.  Usually in situations like that I
21  report to Bealer.  He would say, you know, to call
22  HR or, you know, whoever is in charge of adjusting
23  times or money.
24    Q.  Did you ever tell Mr. Bealer that you
25  had worked through lunch?

Page 39

1    A.  Yeah.
2    Q.  And did he say something to the effect
3  of; well, you should call Mr. Moskal about that?
4    A.  After he would say, well, you have to
5  take lunch.  Kind of like, well, you should have
6  took lunch.  Then it wasn't really trying to fix
7  the issue what I was trying to have fixed.  It was,
8  well, you have to take lunch.
9    Q.  And he would say call Mr. Moskal and
10  tell him?
11    A.  Yeah, he would say, you know, call HR
12  or talk to somebody up there about adjusting your
13  times.  We didn't check in and out for lunch, so it
14  was automatic, so.
15    Q.  How many times do you think you had
16  that kind of conversation with Mr. Bealer where he
17  would tell you to take your lunch and you didn't
18  take it.  And you said, well, you better call HR to
19  get it fixed?
20    A.  With the end and calling HR to fix the
21  problem, probably not that many as compared to most
22  people, you know, we got to start packing your
23  lunch.  Basically, without saying it, you know, eat
24  while you're driving was basically what I was being
25  told without someone saying that word-for-word.

Page 40

1    Q.  When you first started with Empire, was
2  there an orientation of any sort?
3    A.  Well, there was, like, a first
4  interview, yeah.
5    Q.  Do you remember who conducted the
6  orientation?
7    A.  I believe it was Steve.
8    Q.  Okay.  And in the course of that
9  orientation, was the topic of automatic deduction
10  of lunch discussed?
11    A.  I mean, it wasn't labeled as that.
12  We're allowed a half hour for lunch that, you know,
13  is automatically deducted out of your check.  But
14  it was, you know, okay, it's nothing I'm not used
15  to with another company.  I just never been
16  disciplined for actually taking a lunch before.
17    Q.  Did he say that you should take your
18  lunch in that orientation?
19    A.  No, he just said that, you know, we
20  have a half hour lunch that we're entitled to.
21    Q.  Did Martha Milligan participate in that
22  orientation, if you recall?
23    A.  I can't really remember.
24    Q.  When you say you were disciplined,
25  you're talking about a verbal or written, I guess

Page 41

1  criticism?
2    A.  I was verbally warned.  And I think I
3  might have another written warning of, I'm labeled
4  unauthorized stops throughout the workday or
5  something like that, which, you know, during the
6  beginning of employment I was in a vehicle with no
7  air conditioning for probably a whole summer.  And
8  I might have made two or three stops along my route
9  at a store to grab something to drink or while
10  refueling and kind of hot in a steel box with no
11  air conditioning when it's 100 degrees outside.
12    Q.  Okay.  But in terms of receiving verbal
13  warnings or written warnings, how did that change
14  your employment routine; your payments, your
15  salary, anything of that nature, did it change it
16  at all?
17    A.  No.  I mean, nobody adjusted anything.
18  I didn't attempt to keep calling because it was
19  just stress to me about; oh, you have to take your
20  lunch.  But, like I said, when I tried to take more
21  than a 15-minute break, it was brought up to me
22  immediately.  Why were you at this place?  Why were
23  you at that place, you know.  Or three five minute
24  stops that weren't authorized.  I mean, it's just
25  stuff that I've done at every other driving



Page 42

1   position in my whole life and have never been said
2   a word about ever, so I'm just at a loss.
3       Q.   Okay.  Other than having these kind of
4   criticisms leveled at you?
5       A.   Okay.
6       Q.   I mean, did you lose any salary?  Did
7   you have to pay any kind of fine?  Did anything
8   happen to you?
9       A.   No.  I just wanted that half an hour
10  break to get off the road and not deal with drivers
11  for half an hour and enjoy my lunch, that was it.
12      Q.   And you felt there was sort of unspoken
13  pressure not to take your lunch?
14      A.   Unspoken pressure not to take lunch, I
15  really don't understand.
16      Q.   That's good.
17          Do you remember that you mentioned
18  Bealer said to take your lunch, but you felt he was
19  really trying to give a different message?
20      A.   Okay.
21      Q.   Okay.  I'm just wondering if that's,
22  generally, the feeling you had with these various
23  verbal warnings or criticisms; that even though
24  they were saying take lunch, that they really meant
25  you shouldn't and stuff, you know, bring this up?

Page 43

1       A.   Somewhere along that line.  It's just,
2   basically, like I bring a cooler and eat in the
3   truck while you're working, you know, while you're
4   at this stop about to leave, eat real quick and
5   continue on your way.  Well, you know, that's not a
6   half hour, you know, anybody could do that.
7       Q.   Did someone actually tell you to do
8   that?
9       A.   No, that's what I meant earlier by not
10  saying it word-for-word.  So.
11      Q.   That's why I said, that was sort of an
12  unspoken message that you felt was being sent to
13  you?
14      A.   Okay, then, yeah.
15      Q.   Okay.  And when they said take your
16  lunch, they weren't being -- they really didn't
17  mean it?
18      A.   Exactly.
19      Q.   Did you ever see people taking their
20  lunch at the warehouse in between runs?
21      A.   Yes, if you want to call it a lunch,
22  yeah.
23      Q.   Okay.  Why do you say that?
24      A.   Because, you know, you see people going
25  in to sit down with their cooler and they eat and

Page 44

1   they go right back to work loading their truck,
2   filling their paperwork out.  I'm talking about a
3   total of 10 minutes max.
4       Q.   Did you ever try to take your lunch at
5   the warehouse?
6       A.   I've sat down a few times and did that
7   same thing, real quick if I packed something, but
8   like I said, you know, it was less than 10 minutes.
9       Q.   I mean, do you know for a fact that
10  other people didn't take a half hour lunch in the
11  warehouse?
12      A.   I don't know for a fact, no.
13      Q.   Is it your testimony that you never
14  took a half hour break at the warehouse?
15      A.   I'm sorry?
16      Q.   Are you saying that you never took a
17  half hour break in the warehouse?
18      A.   I may have taken, you know, a 20 minute
19  break.  Actually, you know, maybe two times where I
20  would, if I actually sat there.  Then there's been
21  days where everybody's been there and the parts for
22  the afternoon haven't showed up, so whoever is
23  there is, basically, you know, we're not doing
24  anything until the truck comes.  So I don't know
25  how that's, you know, what factors are determined

Page 45

1   in that case if everyone's back and there's nothing
2   to do because the parts ain't there, I don't know
3   how, you know.  I would say it's fair to consider
4   that a break since no one's doing anything.  I
5   would agree to something like that, you know, but.
6       Q.   How often would that happen, if you
7   could quantify that?
8       A.   Not much.
9       Q.   Not much.  When you came to take your
10  lunch at the warehouse, would you basically
11  socialize with the other guys who were having their
12  lunch too?
13      A.   No.  Everybody got back at a different
14  time.  It wasn't like a group thing.
15      Q.   Okay.  So for all you can remember,
16  most of the time you just ate on your own.  Is that
17  right?
18      A.   Yeah.  Maybe one other driver might be
19  in there at the same time.
20      Q.   So just so I'm clear, it's your belief
21  you never took a half hour lunch when you were at
22  the warehouse?
23      A.   No, not when, you know, there are parts
24  are there for the afternoon, you know.  I could
25  load up and go.  I always just pretty much ate and

Page 46

1  then got back to work.
2      Q.  Okay.  Now, is it fair to say there
3  were circumstances where you could have stayed for
4  a half hour, but you decided I might as well get
5  going?
6      A.  Maybe, yeah.  I mean, most of the time
7  with my routes, if I would have done something like
8  that, it might have meant a customer at the end of
9  the day on my route closing before I showed up with
10  their parts.  So it was, mainly, you know, focus on
11  making sure the customers getting their parts
12  rather than sitting around for a half an hour.
13      Q.  Did you feel that the routes that you
14  were given were unreasonable?
15      A.  I thought they were a little excessive,
16  where a couple of stops could have been taken off
17  of mine and put on someone else's.  But I've been
18  also told by people that, like, Jeffrey Bealer that
19  I'm better at doing certain routes, like that with
20  more pressure than other drivers.  So that in
21  itself, you know, well, okay, takes away time from
22  breaks also, especially in the city.
23      Q.  What do you think it is?  Well, first
24  of all, did you feel that your routes were
25  different from the other drivers?

Page 47

1      A.  I felt that they weren't switched up
2  enough as they should be.  I mean, that's kind of
3  like where the personality conflict with Jeffrey
4  Bealer came in.  Like, I got enough experience
5  driving to know that if you have a group of people
6  delivering your product, it would seem a good idea
7  to have each of those people know every route in
8  case one calls out, this person's got to go there.
9  If it's brand new to somebody, they have a higher
10  chance of getting lost and not knowing where to go
11  as compared to somebody who knows that route.  So
12  if everyone's used to every route, you wouldn't
13  have that problem, but they weren't switched up.  I
14  mean, every six months or something like that they
15  would.  I would get switched up or if I got back
16  too late in the afternoon, I would go to a couple
17  stops in Jersey and as compared to going to PA,
18  again, with another set of stops.  That's the only
19  time they were switched.
20      Q.  So just so I understand, did you
21  feel that your route in general was more demanding
22  than some of the routes that other drivers were
23  running?
24      A.  Yes.
25      Q.  Okay.  And you told Bealer that?

Page 48

1      A.  Yes, not all the time, but I did bring
2  it up to him, yes.
3      Q.  Okay.  Did you ever speak to Steve
4  Moskal about that?
5      A.  I don't really remember.  I may have.
6  I mean, I didn't -- I'm not really too much of a
7  person to complain about something like that, so I
8  would say that maybe no.  Even Bealer would counter
9  and say; oh, well, do my route.  I even said okay,
10  let's switch.  And he didn't even do that, so.
11      Q.  So there were times that you skipped
12  lunch and didn't advise either Steve or Jeff.  Is
13  that right?
14      A.  Right.  That's a lot of times.
15      Q.  To the best of your recollection when
16  you did report missing lunch, did you receive the
17  appropriate adjustment to your pay?
18      A.  The one time that I can remember
19  calling Steve and saying that I worked through
20  lunch, he made the adjustment.  And I mean,
21  whenever, I guess, pay time came, but when I
22  received my cheek, it was adjusted.  But during the
23  conversation of the phone call, it was from now on
24  make sure you take your lunch.  That's how the
25  phone call ended.  So I'm not going to keep calling

Page 49

1  every time that I needed an adjustment made when it
2  was just clearly said to me to make sure you take
3  your lunch.  But then it turned into getting, you
4  know, criticized or disciplined for 20 minutes.
5  And then I have a response to that.  And it's, oh,
6  well, most drivers pack their lunch.  So it's, you
7  know, I mean, because I don't know where to go or
8  what else to really say to them not coming out
9  clearly.  And like saying; oh, well, we're going to
10  dock your pay with and we don't want you to use
11  your whole 30 minutes.
12      Q.  Did you take lunch more than once at
13  your mom's house?
14      A.  Like throughout a week?
15      Q.  Yeah.
16      A.  Yeah.  A couple of times, yeah.
17      Q.  Couple of times a week?
18      A.  Maybe twice a week, something like
19  that.
20      Q.  And do you know how many times you were
21  written up about going to your mom's house?
22      A.  I mean, verbally warned.  And I think
23  written up.  And then it was; oh, you're not
24  allowed there period.  But like I said, this was --
25  it was less than 20 minutes I was there, so, and in



Page 50

```
 1   a route on the way back to the shop, just like if I
 2   would have stopped on a McDonald's or anything
 3   else.  It's not like it was out of the way.
 4        There was one time I forgot my license
 5   and I told Bealer, or my wallet, which I had my
 6   license in it.  And I said, you know, when I leave
 7   here, in this case, it was out of the way.  Can I
 8   stop home and grab it real quick.  And he said
 9   yeah.  So, I mean, like, there's stuff like that
10   where I had spoken with Jeffrey Bealer prior to
11   doing that.
12        Q.  Okay.  Focusing on that first
13   conversation with Steve, and he told you to take
14   your lunch, what was your interpretation of his
15   tone in telling you that, if you had one?
16        A.  I mean, his tone sounded, you know,
17   genuine, but, you know, that's why I was kind of
18   like, you know, I didn't know what I was like,
19   being written up or, like, when I'm stopping to
20   take a break, or if it was a couple of stops on the
21   way totaling 15 minutes, like, I didn't understand
22   what I was getting written up, whatever you want to
23   call it, criticized after being told to take your
24   lunch on your way back, you know, in.  So I don't,
25   if I stopped at and made three five minutes stops
```

Page 51

```
 1   or I sat somewhere for a half an hour on the way
 2   back from my morning route, I don't see what the
 3   difference is.  I don't see how that could effect
 4   the end time of me returning back to the shop.
 5        Q.  In that conversation, was Mr. Moskal
 6   angry at you, in your view?
 7        A.  I don't know if he was angry at me or
 8   angry at the fact that he had to come down and give
 9   me this type of write-up.  I don't really know, but
10   he seemed angry, yeah.
11        Q.  I mean, the first time you called
12   asking about, you know, getting paid OT for
13   skipping lunch, and he said take your, you know,
14   take your half hour break?
15        A.  He seemed a little annoyed, maybe, but
16   not angry.  And I didn't ask to be paid OT for not
17   receiving lunch.  I just wanted the adjustment of
18   my check not being docked.  It's not like I worried
19   I want the half hour of time-and-a-half for not
20   working through lunch.
21        Q.  Okay.  Now, you had your wages
22   garnished from Empire.  Is that correct?
23        A.  Yes.
24        Q.  What's that?
25        A.  I ended up making an agreement to
```

Page 52

```
 1   garnishment, but yes.
 2        Q.  How long do you think the garnishment
 3   took place, to the best of your recollection?
 4        A.  Well, probably close to a year if not
 5   at least a year with the IRS.
 6        Q.  Did you ever talk to anyone in
 7   management either -- well, did you ever talk to
 8   Steve about the garnishment?
 9        A.  Yes.
10        Q.  What was the subject of your
11   discussion?
12        A.  Well, how much to pay, like, the IRS
13   each month.  And he set it up for me and all that
14   stuff, you know, did the paperwork or whatever had
15   to be done.
16        Q.  Okay.  Do you feel he was cooperative
17   with you?
18        A.  Absolutely.
19        Q.  Did you feel while you were working
20   there that you had a decent relationship with
21   Steve?
22        A.  I would like to think so.
23        Q.  And in the course of these -- well,
24   strike that.
25        Can you estimate how many conversations
```

Page 53

```
 1   you might have had with Steve about the
 2   garnishment?
 3        A.  Half a dozen, maybe something like
 4   that.  It was really straight forward.
 5        Q.  Did it ever come up in the context of,
 6   you know, your money issues that, you know, the
 7   overtime issue with lunch or that never was
 8   discussed?
 9        A.  I don't really remember.  I may have
10   said to him or somebody that, you know, I'm not
11   okay with the fact that I can't take my lunch and
12   be docked with it at the same time.  It was never
13   pinpointed on lunch being overtime included.  It
14   was just a simple fact that how many hours I worked
15   if, you know, if the hours that I'm docked it's
16   overtime hours.  I mean, I'm already into overtime
17   and, you know, barely took these lunches after
18   being criticized on stopping for more than 15, 20
19   minutes.  So that's, you know, it's clear that it's
20   overtime rate.  It's already over the 40 hours, but
21   it wasn't labeled as that.  It was labeled, I'm not
22   okay with working half an hour for free.
23        Q.  Well, I guess, I was focusing on those
24   conversations about the garnishment.  Do you
25   remember them coming up or is that more -- well,
```



Page 54

1  just answer the question. Do you remember that
2  actually coming up?
3      A.  No.
4      Q.  Now, when you just discussed earlier
5  about how you felt that it wasn't fair that you're
6  basically working half hour for free, did you tell
7  Steve that?
8      A.  I can't remember. I mean, like, I may
9  have. I'm not usually a person to keep stuff like
10  that bottled up for too long without say something
11  to somebody. So if I didn't say something to
12  somebody, I would be kind of shocked, but I can't
13  recollect who.
14      Q.  Okay.
15      A.  I mean, I knew it wasn't going to get
16  anywhere just by what was told to me about taking
17  lunch and bring a cooler. It was so many times
18  that I just gave up. I just, you know.
19      Q.  Well, I'm trying to pinpoint who you
20  told. And you didn't tell Steve that you thought
21  it was wrong to be working for a half hour for
22  free, at least, you don't remember that?
23      A.  Right.
24      Q.  Do you remember telling Jeff that?
25      A.  I think I may have told Jeff that,

Page 55

1  yeah.
2      Q.  Do you remember telling him that?
3      A.  I'm pretty sure I did, because of the
4  whole fact of him bringing, like, the cooler up,
5  is, basically, driving and eating.
6      Q.  And do you have a specific recollection
7  of telling Jeff?
8      A.  Not specifically.
9      Q.  Is that an assumption on your part,
10  based on your personality that you don't keep
11  things bottled up?
12      A.  No. I mean, I can say I'm almost 100
13  percent positive I reacted to one of his times
14  saying about bringing a cooler, about I'm not okay
15  with that, you know, that I disagree with your
16  theory on taking lunch, you know. It doesn't have
17  anything to do with me being outspoken or whatever.
18      Q.  Other than believing you told Jeff
19  that, and anyone else you believe you told at
20  Empire?
21      A.  I probably said that to everybody in
22  the warehouse that I'm not okay with things.
23      Q.  Do you remember saying that to anyone
24  in the warehouse?
25      A.  I said it before to Jose before, but I

Page 56

1  think he was already -- he was already terminated
2  from the company.
3      Q.  Other than Jose, do you remember saying
4  that to anyone else?
5      A.  Mike Dimonte.
6      Q.  You actually remember saying that to
7  Mike Dimonte?
8      A.  Yeah, saying, this is, you know,
9  basically, BS.
10      Q.  Yeah.
11      A.  So it wasn't, you know, it wasn't like
12  a long discussion and in the middle of trying to
13  load our trucks and get out the door. It was just
14  like this is BS. Once we work and we can't stop
15  and take a break from just traffic in general for
16  that 30 minutes or even, you know, even a solid 20
17  without being harassed about it. So.
18      Q.  What Dimonte say, if you remember?
19      A.  He was just pretty much like, yeah,
20  couple more months I'm retired. So whatever, he
21  was just wrote it off.
22      Q.  Okay. Do you think you had one
23  conversation with Dimonte about that shortly before
24  he retired?
25      A.  Maybe. I don't really remember. Like

Page 57

1  I said, it wasn't anything in length to that
2  extent.
3      Q.  Well, I guess, I'm just trying to
4  figure out if you actually have a specific
5  recollection of having that conversation with
6  Dimonte?
7      A.  I have said something to him before
8  that, yes.
9      Q.  That it's BS?
10      A.  Yeah.
11      Q.  Okay. And you think you said that
12  shortly before he was going to retire, he said
13  something about retirement?
14      A.  Yeah. He said something like, I guess,
15  pretty much just maybe go along with my
16  conversation to agree, but not to be on the same
17  page at the same time, you know, or maybe not to be
18  heard by anybody, probably didn't want to, you
19  know, sound like he was taking sides in front of
20  management there. Who knows.
21      Q.  Who was management in Cinnaminson?
22      A.  Jeffrey Bealer.
23      Q.  Anyone else?
24      A.  I mean, maybe Martha Milligan. And I
25  think one other person that used to be a driver



Page 58

1    became a manager.  I can't really remember his
2    name.
3       Q.   Did you ever talk to Martha Milligan
4    about the lunch issue?
5       A.   Not that I can remember, no. I didn't
6    really talk to her about much.
7       Q.   Did you talk to her about anything?
8       A.   When I was rear-ended on the Turnpike
9    that was it, because I was a little bit shooken up.
10   She was, like, don't worry about this, first time,
11   blah, blah, blah.  I guess trying to comfort me
12   about it.
13      Q.   Other than Mike Dimonte and Jose
14   Cologne, is there anyone else that you discussed
15   the lunch issue with, other than Bealer down in
16   Cinnaminson?
17      A.   Not that I can remember.
18      Q.   Other than your attorney, is there
19   anyone not associated with Empire that you spoke
20   about your lunch issues with?
21      A.   My lunch issues?
22      Q.   Yeah.
23      A.   Yeah, probably everybody I know.
24   Sorry.
25      Q.   Do you remember having specific

Page 59

1    discussion with any particular person?
2       A.   Any discussion that would be any
3    different than what I just basically said to
4    everybody about how things are run with the whole
5    lunches there being BS.
6       Q.   Right.  So that's what I'm trying to
7    figure out, because you're saying I talked to
8    everybody.  I'm trying to find out who those people
9    are.
10      A.   You're saying not relevant to Empire?
11      Q.   No, I'm saying people other than
12   Empire.
13      A.   Okay.
14      Q.   Within Empire you said, if I understand
15   this correctly.
16      A.   You asked me people other than Empire,
17   meaning, like, anybody?
18      Q.   Yes.
19      A.   Like my family and friends?
20      Q.   Yes.
21      A.   Yeah.  I mean, naturally, I would, you
22   know, I would talk to my family about what's going
23   on in my life.  Yeah.
24      Q.   Okay.  When you say about talking to
25   your family, who are the family members that you

Page 60

1    spoke with?
2       A.   My mom, my brother, both my sisters, my
3    stepfather.
4       Q.   Is there any one of them you feel you
5    had the most communication with about your
6    unhappiness with the lunch policy at Empire?
7       A.   I live with my brother, so it's -- and
8    my stepfather, but he's not really home much.  He
9    travels for business, but I'm pretty close to my
10   little brother.  So I would say he would have heard
11   most of it more than anyone.
12      Q.   Right.  What's his name?
13         THE WITNESS:  Do I have to answer that?
14         MR. MILLER:  Yup.
15      A.   Dalton.
16      Q.   Does he live with you now?
17      A.   Yes.
18      Q.   How old is he?
19      A.   20.
20      Q.   And do you remember having frequent
21   conversations with him about your unhappiness with
22   Empire's lunch policy?
23      A.   No, like, anything frequent?  I mean,
24   we're not -- we don't go around all day just
25   complaining about life.  I would come home and this

Page 61

1    is BS, basically, or, you know, like, if I was
2    having a conversation with my lawyer on the phone
3    and he tried to talk to me.  I'd be, like, quiet,
4    I'm on the phone with my lawyer.  Oh, what's that
5    about?  I would explain to him.  It wasn't like I
6    spent my time home complaining about work.  Like I
7    have a gift of turning off work when I walk out the
8    door of work.
9       Q.   So just so I understand, your
10   discussions with your family were very?
11      A.   Brief.
12      Q.   Brief.  And didn't go into any kind of
13   detail about what you're unhappy with.  Is that
14   right?
15      A.   Besides just the fact that I didn't get
16   anywhere close to time to be considered a lunch
17   period, to be docked 30 minutes.  And that they
18   told me to pack a lunch every day to try to get
19   around, you know, compensating that 30 minutes for
20   lunch; that was, like, the extent of, you know,
21   getting into detail with my family and friends.
22      Q.   And you said that on occasion, but not
23   all that often.  Is that right?
24      A.   Yeah, a few times.  It wasn't --
25   unnecessary to keep going on about it.  It didn't



Page 62

1   change throughout until I was terminated, so.
2       Q.  Did you ever pack a lunch or take a
3   cooler?
4       A.  Well, after getting criticized about
5   it, yeah, as much as I could.  I mean, I can't go
6   all day not eating nothing and drinking nothing for
7   nine, 10 hours a day, especially if I have a truck
8   with no air conditioning.
9       Q.  Did anyone ever tell you that you would
10  be fired if you continued your practice of taking
11  lunches in a manner contrary to what Empire policy
12  was?
13      A.  I guess eventually, yes, I've been told
14  that would have happened after, like, suspensions
15  and stuff like that which I, you know, didn't want
16  that to happen just as much as not being
17  terminated.
18      Q.  Were you ever suspended?
19      A.  No.
20      Q.  Were you ever threatened with
21  suspension?
22      A.  Yeah.
23      Q.  Who threatened you?
24      A.  Well, Steve warned me or not say
25  threatened, but he warned me about, you know,

Page 63

1   called it unauthorized stops if it was to continue
2   that, you know, further disciplinary action would
3   have to be taken, like, suspension and then
4   thereafter termination.
5       Q.  Now, when did that conversation take
6   place?  Was that toward the end of your employment?
7       A.  Maybe, you know, halfway through or I
8   can't really exactly remember.  I don't think it
9   was towards the end of it because I wasn't
10  terminated for unauthorized stops or lunches.
11      Q.  So you took what Steve had to say in
12  terms of, if this keeps up, you could be suspended
13  or terminated as a threat?
14      A.  I guess so.  Stuff, like, stop going to
15  my house.  I stopped taking, you know, basically,
16  stopped taking a rest stop.  That's, basically,
17  what I wanted to do was take a rest from driving,
18  so I stopped doing that period.
19      Q.  So you don't believe he was just sort
20  of telling you how the process works if you keep
21  getting written up?
22      A.  Well, yeah, that's what I meant.  Like
23  he's, basically, warning me of what's going to
24  happen as far as company policy if I keep getting
25  written up for what I was being written up for.  It

Page 64

1   was the whole thing of what I was being written up
2   for which was, I guess, you could say unfair,
3   according to me or whatever.
4       Q.  Right.
5           MR. HERTZBERG:  Could you mark this as
6   the next exhibit, please.
7           (Exhibit JR-4, Employee Written Warning
8           Notice dated 1/31/11, was marked for
9           identification.)
10          (A recess transpired.)
11      Q.  I've given you an Employee Written
12  Warning Notice, dated 1/31/11.
13      A.  Okay.
14      Q.  Is that your signature on the bottom of
15  the page?
16      A.  Yes.
17      Q.  You see it says:  "Failing to drop
18  money in an envelope at the end of the day.  The
19  money turned up two days later."
20      A.  Yes.
21      Q.  Do you remember that incident?
22      A.  Yes.
23      Q.  What was that about?
24      A.  Exactly what it says.  I had the
25  paperwork and I had my money counted out, like,

Page 65

1   prior to getting back to the shop.  I did it at my
2   last stop.  And I just forgot to put the stuff in
3   the envelope with my drop.  And it was still in my
4   binder that I use, like, with customer signatures.
5   And I was flipping through to get -- I used to make
6   copies of stuff in case I had to revert back for
7   parts for customers, just to make it easier for me.
8   I was flipping through, all right.  What's this
9   money from?  When I realized I forgot to drop it
10  with my paperwork.  So it was in my binder the
11  whole time.  Just an honest mistake trying to rush
12  out at the end of the day.
13      Q.  I recognize it's from 2011.  Can you
14  remember about how much money you're talking about?
15      A.  Not exactly.  I mean, it -- most of the
16  time it was usually I dealt with a couple hundred
17  bucks a day.
18      Q.  And do you recognize the management
19  signature?
20      A.  No, not really.  I think it was Steve,
21  but.
22      Q.  Do you remember talking about that with
23  Steve?
24      A.  Yes.
25      Q.  Over the course of your time with



Page 66

1  Empire, did you receive more than three written
2  warnings?
3      A.   More than three?  I can't -- I don't
4  exactly remember, but I think three might have been
5  the most.  Written warnings or verbal and written?
6      Q.   Verbal and written.
7      A.   Yeah, probably more than three, yeah.
8  This is just marked verbal, so I didn't know what
9  you meant by that.
10     Q.   Okay.  And just so I'm clear, going
11  back to something that we talked about.  When you
12  said people took lunch in the warehouse, are you
13  talking in between the routes, right; come
14  back from the morning, have lunch, then go out in
15  the afternoon.  Is that right?
16     A.   Yes.
17     Q.   Okay.
18          MR. HERTZBERG:  Could you mark this as
19  the next one, please.
20          (Exhibit JR-5, Employee Written Warning
21          Notice dated 6/30/11, was marked for
22          identification.)
23     Q.   Do you remember this warning?
24     A.   Yes.
25     Q.   Do you see where it says:  "Excessive

Page 67

1  stops at home with company vehicle throughout the
2  workday."?
3      A.   Yes.
4      Q.   Is that your signature on the bottom?
5      A.   Yes.
6      Q.   And do you recognize the management
7  signatures?
8      A.   No.  Well, the one signature I think is
9  Steve's at the top.  And I don't recognize...
10     Q.   Do you remember the context of the
11  discussion here?
12     A.   Somewhat, yes.
13     Q.   What's your recollection?
14     A.   They asked me why I stopped at my house
15  more than once in the workday.  At the time that
16  this happened, I believe that the vehicle I was
17  driving did not have air conditioning.  And I
18  probably stopped there, I think, two times in the
19  course of leaving and coming back, on the way back,
20  to stop to grab more -- something to drink.  I
21  mean, there was days there where it was so hot, I
22  would have a cold frozen bottle and it would be
23  melted in a couple of hours and I would have a
24  drink by then.
25     Q.   Would you agree that, at least as

Page 68

1  regards to your remarks, that the fact that you
2  stopped at home in and of itself wasn't the cause
3  of the discipline?
4      A.   I'm sorry, say that again?
5      Q.   If you read the remarks it says:
6  "Failure to communicate with supervisors or
7  Garfield office regarding excessive stops at home."
8  It says that, right?
9      A.   Yeah.  I failed to notify them about
10  it.
11     Q.   Isn't that the reason for the warning,
12  assuming that the remarks are accurate, that you
13  failed to communicate that you were stopping at
14  home?
15     A.   Right, correct.
16     Q.   And was that the problem with many of
17  your stops at home, that you were told you have to
18  let us know where you are?
19     A.   I don't think so.  I think it was that
20  just that the time being spent other than working.
21     Q.   Do you recall in any conversation about
22  unauthorized stops, you being advised that a
23  significant problem with that is your failure to
24  communicate that you were doing so and that people
25  didn't know where you were?

Page 69

1      A.   No, I don't recall that.  They know
2  where you're at all the time.  They have a tracking
3  device in the truck.
4      Q.   Okay.
5      A.   And I didn't, when it was on the way
6  back, I didn't -- I wasn't informed that we had to
7  inform them where we were taking our break or
8  lunch.  So to say, I was never told that.
9      Q.   Well, after you're written up there for
10  failing to communicate, did you communicate where
11  you were taking lunch?
12     A.   If I did take a lunch, yeah.
13     Q.   And who did you advise?
14     A.   I would call Jeff Bealer.  He sets up
15  the afternoon route.  So I would call him, that way
16  he could have time to adjust whatever adjustments,
17  if needed be for whatever time I was taking.  But
18  it was, you know, 10 minutes or something here or
19  there.
20     Q.   So Jeff Bealer made the adjustments if
21  you called up and said, I'm taking a 10-minute
22  break?
23     A.   No, if I was going to take a lunch.
24     Q.   You mean a half hour lunch?
25     A.   Right, but after, that didn't last that



Page 70

1 long.
2    Q.  Okay.  So after that point, you stopped
3 communicating as to what breaks you were taking?
4    A.  I mean, I guess you could say that I
5 didn't call in every time I passed a 7-Eleven or
6 something like that, no.
7    Q.  Do you know if there was any company
8 policy about communicating your location?
9    A.  No.  I wasn't aware of one, if it was a
10 short stop.
11    Q.  Okay.  To the best of your
12 recollection, there was no company policy to advise
13 Empire if you were deviating from your designated
14 route?
15    A.  Yes, I think there is a policy for
16 that, if I was deviating -- do you mean going off
17 course?
18    Q.  Right.
19    A.  Well, I don't really believe that that
20 was off course, so.
21    Q.  Okay.  I'm just asking if you know if
22 there is a policy?
23    A.  Yeah, I do know.
24    Q.  And to the best of your recollection,
25 you never went off course.  Is that correct?

Page 71

1    A.  No, not never.  I've informed them if I
2 was going off course.
3    Q.  So any time you went off course, to the
4 best of your recollection, you advised Empire that
5 you were doing that.  Is that right?
6    A.  I let somebody know, yeah, either Jeff
7 Bealer --
8    Q.  You'd call in?
9    A.  Yes, or if it was something I knew
10 about prior to leaving the shop, I would ask him or
11 let him know.
12    Q.  Okay.  And what would his response be,
13 if you recall, to your advising that you were going
14 off route?
15    A.  I, most of the time, it wasn't a
16 problem.
17    Q.  No?  Okay.
18    A.  It would be, I would say, I would take
19 it off of any time, according to lunch, you know.
20 I would sacrifice time off of that if I had to do
21 something like that.
22    Q.  What kind of circumstances would there
23 be that would cause you to go off route?
24    A.  Like when I forgot my wallet or if I
25 had to stop.  I paid my cell phone bill uptown.

Page 72

1 They didn't issue a company cell phone.  So I had a
2 prepaid, I have to communicate with them, and my
3 phone gets shut off then, you know.
4    MR. HERTZBERG:  Could you mark the next
5 one, please.
6    (Exhibit JR-6, Employee Written Warning
7    Notice dated 12/8/11, was marked for
8    identification.)
9    Q.  Okay.  I'm showing you JR-6, which is
10 an Employee Written Warning Notice dated December
11 8, 2011.  And do you remember that warning?
12    A.  No.
13    Q.  Do you recall, generally, around that
14 time there being an issue with check payments?
15    A.  I do remember a time.  I don't know if
16 it was this time, because one of my customers
17 forgot to sign their check.  And I didn't take
18 notice to it, so pretty much just walked, left the
19 customer's location with an unsigned check, so it's
20 basically useless.  I mean, please see attached
21 memo, so that's not included with this paper so I
22 can't really...
23    Q.  It says: "Please pay attention."  At
24 the bottom, right?
25    A.  Right.  That's why I'm saying it's

Page 73

1 probably something to do with a customer signature.
2 I didn't pay attention to everything on the check.
3    Q.  Did that happen more than once?
4    A.  Yeah, couple times.
5    Q.  Was it a problem you were spoken to
6 more than once?
7    A.  More than once, probably, yeah.
8    Q.  Okay.
9    MR. HERTZBERG:  Could you mark this as
10 the next document, please.
11    (Exhibit JR-7, Employee Written Warning
12    Notice dated 5/22/12, was marked for
13    identification.)
14    Q.  I'm showing you JR-7, a document dated
15 May 22, 2012, entitled Employee Written Warning
16 Notice.  It says:  You were warned personally by
17 myself on January 18, 2011 in regards to monies not
18 dropped at safe."  Do you see where it says that?
19    A.  Yes.
20    Q.  Tell me about what happened?
21    A.  I forgot to drop the payments in the
22 safe.  It was in my clip board.
23    Q.  Sort of what happened before that you
24 described?
25    A.  Yeah.



Page 74

1    Q.  Do you remember who you discussed this
2  with?
3    A.  Steven and I think Jeffrey Bealer also.
4    Q.  As compared with the discussions about
5  your, you know, your lunch issue, was this kind of
6  discussion one that had a more serious tone?
7    A.  Naturally, yeah.
8    Q.  Do you remember how much money you
9  forgot to drop in the safe on this occasion?
10    A.  No.
11        MR. HERTZBERG:  Could you mark this as
12  the next document, please.
13        (Exhibit JR-8, E-mail Thread, was
14          marked for identification.)
15    Q.  Okay.  I'm showing you an e-mail thread
16  that runs from June 27, 2012 to June 29, 2012.  And
17  just read through that and let me know -- do you
18  understand what happened in this incident?
19    A.  This might have been a personal check
20  that I accepted.
21    Q.  Okay.  And you see in the course,
22  there's a couple of incidents -- strike that.
23        Do you see in the course of this
24  thread, there's a couple of comments that you just
25  dodged a write-up?

Page 75

1    A.  Right.
2    Q.  Do you see in the middle of the second
3  page, there's an e-mail from Steve to Jeff
4  indicating that you should have called?  Do you see
5  where it says that?
6    A.  Yeah.
7    Q.  Was this discussed with you about a
8  failure to communicate?
9    A.  It was discussed with me.  I don't know
10  if it was on the lines of failure to communicate.
11    Q.  Looking back at this, should you have
12  called?
13    A.  Yeah, I didn't know if it was a
14  personal check, really, at the time.
15    Q.  Okay.
16    A.  We had one customer also on my route
17  that was, I guess, given special privileges as far
18  as personal checking.  So I may have confused that
19  as that being okay, instead of communicating.  So
20  that's when I found out about our no personal check
21  policy.
22    Q.  You haven't heard anything about a no
23  personal check policy with a new customer?
24    A.  No.
25        MR. HERTZBERG:  Okay.  Could you mark

Page 76

1  this as the next document, please.
2        (Exhibit JR-9, Employee Written
3          Warning Notice dated 10/3/12, was
4          marked for identification.)
5    Q.  Okay.  I'm showing you Exhibit 9, dated
6  October 3, 2012, Employee Written Warning Notice.
7  And is that your signature under employee
8  signature?
9    A.  Yes.
10    Q.  Do you see it regards speeding
11  violations, correct?
12    A.  Well, according to their Geotab, yeah.
13  I didn't receive a ticket from the police
14  department.
15    Q.  Well, were you driving that fast?
16    A.  I mean, I don't believe so.  I argued
17  this fact before.  Most of their vehicles could
18  only go, like, a maximum speed of 70 something
19  before a governor kicked in.
20        At this time, I may have been on a
21  highway and passed somebody.  I don't believe it
22  was anywhere near 91 miles an hour.  So I don't
23  know how accurate their Geotab was in reporting
24  that.  Maybe it's not calibrated.
25    Q.  Well, before you signed off on this, do

Page 77

1  you remember having any discussion where you
2  questioned the Geotab?
3    A.  Yeah, I said that to him before.  I
4  mean, one of their -- the write-ups I've written
5  something next to my signature about one of the
6  vehicles.  I can't exactly remember what write-up
7  that was, but I still haven't seen that yet, so.
8    Q.  Had you been told more than once about
9  the fact that, at least, Empire believed that you
10  were speeding?
11    A.  I think another time.
12        MR. HERTZBERG:  Okay.  Could you mark
13  this as the next one, please.
14        (Exhibit JR-10, Employee Written
15          Warning Notice dated 11/29/12, was
16          marked for identification.)
17    Q.  Okay.  I'm showing you exhibit JR-10,
18  Employee Written Warning Notice, dated November 29,
19  2012.  And under remarks it reads:  "You were
20  verbal warned on August 24, 2012 of making stops
21  not relating to your delivery log.  This incident
22  was regarding stopping home.  Just recently you had
23  made four additional stops on November 23, 2012
24  that were not part of your schedule.  We talked in
25  length on how this effects the entire staff on



Page 78

1  November 28, 2012. Any future incident will result
2  in a one-day suspension and/or termination." Do
3  you recall this warning?
4       A.  Yeah, somewhat.
5       Q.  Okay.  What do you recall about it?
6       A.  I believe this was maybe a day after
7  Thanksgiving or something.  I could be mistaken.  I
8  think I stopped, what I believe, was my mother's
9  house at the time, my previous residence, but I was
10  not living there on this date.
11            Stopped for a quick grab a turkey
12  sandwich that she made for me.  I was there for
13  maybe a total of seven minutes.  I don't exactly
14  remember the other stops.  It might have been a
15  7-Eleven or smoke shop on the way back on the
16  bridge that I come over to come back with.  I
17  believe all these, like, total altogether were not
18  exceeding anything as far as 30 minutes and not out
19  of the way on my route.  So I don't really -- I do
20  remember them saying something about that though.
21  It was the day after Thanksgiving.  I stopped there
22  for lunch.  I didn't have any money for lunch so
23  that part I do remember.
24       Q.  Did you, in the course of your routes,
25  periodically stop at smoke shops?

Page 79

1       A.  Couple times a week maybe, generally,
2  usually, get my cigarettes like, you know, few
3  packs at a time.  So it's not like I needed to deal
4  with that every day.  And it's only with, you know,
5  on certain routes.  If it was literally on the way
6  back or on the way there, there was nothing out of
7  the way.
8       Q.  Do you remember being warned in or
9  around August 24, 2012 of making stops not relating
10  to your delivery log?
11       A.  Yeah.
12       Q.  Do you remember what was said about
13  that?
14       A.  I don't remember exactly what was said
15  about it, no.  I remember being warned about it
16  though.
17       Q.  So did you meet with Empire personnel
18  in connection with this warning notice?
19       A.  Steve gave me the write-up, yeah.
20       Q.  Where did the meeting take place?
21       A.  In Cinnaminson.
22       Q.  Okay.  Was anyone else there besides
23  you and Steve?
24       A.  I think Bealer might have been in the
25  room with us also, Jeffrey Bealer.

Page 80

1       Q.  Do you remember him being there?
2       A.  I mean, I think he was there.  I can't
3  exactly remember.  But I recall times where both
4  him and Steve Moskal were present in the room
5  during, you know, them giving me the write-up.
6       Q.  Okay.  And where in the office did this
7  conversation take place?
8       A.  I guess you could say the conference
9  room or the room where we dropped our paperwork and
10  money in.  I guess that's what you would call it, a
11  conference room.
12       Q.  How did you find out that you were
13  being warned on this incident?
14       A.  I came -- when I came back in, maybe at
15  the end of the day, they called me in the office.
16       Q.  And tell me to the best of your
17  recollection what was said and by whom?
18       A.  Steve and Bealer, basically, said that,
19  you know, about not making these stops and not
20  communicating about it or stuff like that.  I,
21  basically, like I said, you know, if I took a lunch
22  or whatever, you know, I got written up anyway for
23  stopping somewhere.  So I didn't really see a need
24  to communicate if I'm making a couple,
25  couple-minute stops.

Page 81

1       Q.  Were you asked to make efforts to
2  communicate even with short stops?
3       A.  I don't think it was labeled as short
4  or long, just stops period, that I was asked to
5  communicate with.
6       Q.  And is it fair to say you had been
7  asked to do that sometime prior to this warning
8  notice?
9       A.  Yeah.
10       Q.  And you decided not to do that because
11  you thought it wouldn't make a difference anyway.
12  Is that right?
13       A.  Right.  I'm still going to get written
14  up anyway, so.
15       Q.  To the best of your recollection,
16  exactly what did Steve Moskal say?  Did he start
17  the conversation?
18       A.  I can't remember.
19       Q.  Okay.  Do you remember what you said?
20       A.  No, not exactly, no.
21       Q.  Do you remember anything you said in
22  that conversation?
23       A.  I apologized for it, but I mean, I
24  didn't really get anywhere with it.  I remember
25  explaining the fact of stopping home.  I'm sorry,



21 (Pages 78 to 81)

Page 82

1   stopping at my mother's house at the time to grab a
2   turkey sandwich off of her that I had called her
3   and asked her to make. I know I wasn't there for
4   that long. I walked in, picked it up and left.
5   And I remember that part I explained.
6       Q.  You don't remember anyone saying words
7   to the effect; well, you just got to let us know?
8       A.  Yeah, but, again, I was never really
9   like that.
10      Q.  I'm sorry, what did you say? You never
11  liked that?
12      A.  It was never really like that. I mean,
13  they say that, but it was never, you know, really
14  like that. It was never really approved to stop
15  anywhere and have the whole lunch then or anything
16  that added up to 20 minutes.
17          MR. HERTZBERG:  Can you mark this as
18  the next document, please.
19          (Exhibit JR-11, Driver Notice and
20          Exchange Report, was marked for
21          identification.)
22      Q.  Okay. I'm showing you what's been
23  marked JR-11. And it's a Commonwealth of
24  Pennsylvania, Driver Notice and Exchange Report,
25  and it's dated February 11, 2013.

Page 83

1       A.  Okay.
2       Q.  And have you seen this before today?
3       A.  Yeah.
4       Q.  And when did you first see this?
5       A.  The day of the accident on the PA
6   Turnpike.
7       Q.  Do you see under about two-thirds of
8   the way down the page where it says violations?
9       A.  Okay.
10      Q.  It says: Driving too fast for
11  conditions?
12      A.  Yeah, I see that.
13      Q.  What were the conditions?
14      A.  It was, like, somewhat just had got
15  done raining, so I'd say 10 minutes. I was just
16  going with the flow of traffic though.
17      Q.  Did you tell the police that you were
18  going with the flow of traffic?
19      A.  Yes.
20      Q.  Okay. Did you notice that he put
21  driving too fast for conditions?
22      A.  Yes.
23      Q.  Did you say anything about that?
24      A.  Well, I mean, I wasn't given a ticket
25  or charged with anything. So, I mean, I just

Page 84

1   assumed that it was his assumption. I mean, we had
2   to wait there for a while to get there. So it
3   wasn't like he clocked me or anybody else at a
4   certain speed.
5       Q.  Were you aware that there was a policy
6   at Empire that they reserve the right to terminate
7   people who have rear-ended cars?
8       A.  No, I wasn't.
9       Q.  Okay.
10      A.  That wasn't even explained to me the
11  day I came back from the accident.
12      Q.  Were you aware, well, strike that.
13          So what were you told when you were
14  terminated?
15      A.  When I was terminated? Do you want to
16  know what I was told when I was terminated or in
17  relation to this?
18      Q.  What were you told when you were
19  terminated?
20      A.  I was told by Jeffrey Bealer that
21  whoever is in charge up in Empire, you know, at the
22  main branch, held me responsible for this accident,
23  but that wasn't the coin flip of me being
24  terminated. The coin flip of me being terminated
25  was, they assumed I used a company vehicle and went

Page 85

1   off course of my delivery route, clocked out of —
2   actually, clocked out this time for lunch to go
3   cash my check at the check cashing place. But that
4   particular day I had somebody else's vehicle, so
5   they're used to me not coming in with a vehicle.
6   And I clocked out and I took my personal vehicle to
7   cash my check and was back in 27 minutes. And then
8   I continued to work by, you know, loading up the
9   truck and getting in the company vehicle, which
10  Jeffrey Bealer was not aware of. He just assumed
11  that I used the company vehicle and went off course
12  in my route, on my lunch break, to cash my check,
13  which the Geotab device will clearly show that the
14  vehicle stayed at the Cinnaminson location when I
15  clocked out.
16      Q.  So let me get it straight. Bealer said
17  that management was terminating you because you
18  misused company property to go and cash your check?
19      A.  Yes, basically.
20      Q.  Did you ever hear that from anyone else
21  other than Bealer?
22      A.  No.
23      Q.  Go ahead.
24      A.  I never received a written termination
25  letter as well, so.

Page 86

1    Q.  Did you ever ask Steve Moskal about
2  this situation that you thought there was a
3  mistaken belief about what you were doing?
4    A.  No.
5    Q.  Did you tell Bealer that wasn't the
6  case?
7    A.  Yes.
8    Q.  And what did he say?
9    A.  I said it was -- he said, well, they're
10  still holding you at fault for the accident, which
11  it took them, what, you know, two weeks to figure
12  that part out from the date of the accident where
13  they terminated me.  That's a little bit strange.
14    Q.  So when Bealer told you he actually
15  used the words, "flip of the coin"?
16    A.  No, but he said, basically, after the
17  whole accident thing, he said, what, I guess,
18  somewhere around; what really topped it off or
19  somewhere along those words, was the fact that I
20  clocked out and I clocked out for lunch to go cash
21  my check.
22    Q.  Okay.  So --
23    A.  He thought I used the company van to do
24  that.
25    Q.  Right.  So more or less, if I

Page 87

1  understand correctly, Bealer was telling you this
2  was sort of a last straw, like?
3    A.  Yeah, like, the whole clocking out for
4  the lunch to go cash my check was, like, the last,
5  okay, we've had enough or whatever.
6    Q.  So they weren't happy at all about the
7  accident.  And this was just the last thing they
8  were going to deal with.  Is that right?
9    A.  From how he put it, yeah.  But then I
10  said he was incorrect about me using the company
11  vehicle.  And he reverted back to, well, there's
12  still the vehicle.  Well, I mean, you know, if that
13  was, like, really the case, then I should have been
14  terminated a lot sooner than two weeks.
15    Q.  Did you take a job after you left?
16    A.  No, I was on unemployment.
17    Q.  For how long?
18    A.  Until September that following year --
19  that same year, so seven months.
20    Q.  And where did you get a job then?
21    A.  Place called EMSL in Cinnaminson.
22    Q.  What kind of job did you get there?
23    A.  Maintenance job.
24    Q.  What kind of maintenance?
25    A.  Like office and apartment renovations

Page 88

1  and labeled it as maintenance of, I guess, you
2  could consider it light construction, something
3  like that, building maintenance.
4    Q.  And how long were you there?
5    A.  Not even two weeks.
6    Q.  Oh, okay.  Where did you go after that?
7    A.  Back on unemployment.  I, actually,
8  injured myself there.
9    Q.  What happened?
10    A.  I was pulling up commercial carpet and
11  it was, like, glued down commercial carpet.  And I
12  was like near the end of, like, a strand that I
13  cut.  And somehow went up this little step and
14  twisted the wrong way and something in the upper
15  part of my leg popped.  And I just went right down.
16  I had no idea how I did it or what happened, but I
17  pretty much drove back to the office and went right
18  to the hospital.
19    Q.  What was it?
20    A.  They said it was an upper lumbar or
21  lower lumbar strain, whatever that means.  And I
22  needed a referral from, like, my regular doctor in
23  order to get an MRI at the hospital, which I didn't
24  have insurance at the time.  And my doctor wanted
25  $125 to walk into his office, which I also did not

Page 89

1  have.  So pretty much got left at that, which I
2  talked to a lawyer in Burlington about it and he
3  basically --
4    MR. MILLER:  Don't say what you talked
5  about with your attorney.
6    THE WITNESS:  Okay.
7    Q.  That's right.  I should have cut you
8  off there.
9    MR. MILLER:  That's fine.
10    A.  Nothing happened, so couldn't be
11  pursued.
12    Q.  Did you get -- did you take a job
13  eventually after being on unemployment?
14    A.  No, I haven't had anything.  I haven't
15  had anything permanent since then.
16    Q.  Okay.  You do occasional construction
17  jobs?
18    A.  Once in a while I'll do, like, side
19  jobs, like, with myself, for myself for friends and
20  family, but I have nothing that's, you know, that
21  I'm solidly hired on right now.
22    Q.  Okay.  Are you looking for work?
23    A.  Yes.
24    Q.  Are you married?
25    A.  No.



Page 90

1    Q.  Do you have any kids?
2    A.  Yes.
3    Q.  How many?
4    A.  One.
5        MR. HERTZBERG:  Could you mark this as
6    the next document, please.
7        (Exhibit JR-12, Check View-Rollup
8        Totals, was marked for identification.)
9    Q.  I'm going to show you JR-12 which says,
10   Check View-Rollup totals.  Name is Jason, well,
11   Reed, Jason D.  And I'll ask you if you recognize
12   this?
13   A.  Yes.
14   Q.  What is it?
15   A.  It's, like, a breakdown, basically, of
16   my pay stubs.  So to say that I asked Steve for a
17   few months after I was terminated, because I was
18   having problems with my son's mother, as far as
19   child support goes.  And I knew if it was going to
20   end up in court that they're going to want to see,
21   you know, my past employment for whatever updates.
22   Q.  In the top there's a fax ledger that
23   says A&C Supply, LLC.  Do you see where it says
24   that?
25   A.  Yeah.

Page 91

1    Q.  What is that?
2    A.  That's a company that I used to work
3    for.  I told you when I was living in East Hudson.
4    Conveniently, I guess, would be the word.  They
5    just recently, within the past couple of years,
6    moved into a vacant commercial building directly
7    across the street from my house.  So since I knew
8    the guy from prior employment, I walked over there
9    and asked him if I could use his fax machine in
10   order to get the information from the computer to
11   print it out.  Like I said, I don't have a personal
12   computer.
13   Q.  And Steve was cooperative in getting
14   you this?
15   A.  Yes.
16   Q.  Now, at the time you spoke with Steve,
17   were you considering filing this suit?
18   A.  No, I don't believe so, at the time.
19   Q.  Between --
20   A.  I filled out stuff on, like, the
21   computer about it, as far as, like, you know,
22   putting what happened out there.  I think, like, on
23   a website for, like, lawyers.  And they contacted
24   me, so.
25   Q.  When you say "they" you mean your

Page 92

1    attorneys?
2    A.  Yeah, my attorney.
3    Q.  How did you find out that there was a
4    website you should put information on?
5    A.  On unemployment.  The guy at
6    unemployment told me about it.  I don't remember
7    his name.
8    Q.  How did that come up in your
9    conversation with the unemployment guy?
10   A.  Because they pretty much, like, when
11   they had my interview, they were, like, pretty
12   much; okay, the accident that you're in, were you
13   at fault?  And I said, "Well, it says speeding
14   violation."  He's, like, "Well, did you get a
15   ticket from the police officer?"  And I'm like,
16   "No."  Well, then you're not at fault.  And I told
17   him about, you know, used a company vehicle.  Well,
18   this is -- this is all in your favor as far as
19   unemployment goes and he referred me to the site.
20   Q.  So you were looking, basically, for
21   unemployment representation?
22   A.  Yeah, which I mean I received.  I
23   didn't go onto the site until sometime later.  I
24   don't have a personal computer.  It wasn't like I
25   rushed out of my house to go to it.

Page 93

1    Q.  Does your current counsel represent you
2    in the unemployment matter?
3    A.  No.
4    Q.  Okay.  So from the standpoint, a guy
5    gave you a website, you should check out to see --
6    well, strike that.
7        Why did the unemployment guy give you
8    this website?
9    A.  That's what I couldn't figure out.  I
10   mean, I never served any of them, type of people to
11   go out of their way to say stuff like that.  I
12   mean, he was a pretty chuckly outgoing state person
13   that I've ever dealt with.
14   Q.  What did he say why he was giving this
15   to you?
16   A.  Well, because, I told him, you know, I
17   thought this was just pretty much an excuse to
18   pretty much, like, get rid of me.  And I went into
19   the whole thing about the lunches with him.  And he
20   said, it sounds like a wage issue.  Here's this
21   website, which I can't even remember.  You could
22   type it up and see if somebody contacts you back.
23   Okay.  Whatever.  I thought it was a shot in the
24   dark.  So I didn't really pursue it right away.
25   Q.  Okay.  Eventually you did and you were

Page 94

1  contacted by current counsel.  Is that right?
2      A.  Right.  I also read up also too on,
3  like, labor laws and to see if it was something
4  that could be pursued.
5      Q.  Did you do anything to prepare for this
6  deposition?
7      A.  What do you mean?
8      Q.  I mean, did you review any documents?
9  Did you meet with anybody?
10     A.  Not really, no.  I didn't meet with
11  anybody.
12     Q.  Did you review any documents?
13     A.  Reading some of these documents, like,
14  that are here in front of me over my phone because
15  that's the only way I could view stuff.  It's kind
16  of difficult on your phone.  You got to blow stuff
17  up with your fingers.  Do you know what I mean?
18     Q.  Do you remember which ones you looked
19  at?
20     A.  This is JR-2, the initial
21  interrogatories, I skimmed through them about it.
22  I had, like, this is on, like, my e-mail that I
23  view through my phone.
24     Q.  You say "this" why don't you identify
25  it.

Page 95

1      A.  JR-12, the check view or my pay stubs.
2      Q.  JR-12 is fine.
3      A.  Okay.
4      Q.  Without telling me anything that was
5  discussed, did you speak to your attorney about the
6  upcoming deposition?
7      A.  Well, yeah.
8      Q.  Okay.  I mean, about the substance of
9  it or just that it's happening to be there?
10         MR. MILLER:  You can say you spoke to
11  us, that's it.
12     A.  Yeah.
13     Q.  When did you speak with them?
14     A.  Prior.  Before our original date, I
15  guess.
16     Q.  Okay.  Was it your practice while
17  driving always to do a follow the flow of traffic?
18     A.  No, I mean not all the time.
19     Q.  Well, to the extent that you traveled
20  both speed limit and exceeded the speed limit,
21  would that only be in situations where you were
22  following the flow of traffic?
23     A.  Either that or passing someone in a
24  different lane and then back down to the flow of
25  traffic.

Page 96

1      Q.  Did you ever speed up because you're
2  behind on your route?
3      A.  Maybe.  Maybe, but I never really, you
4  know, not 91 miles an hour consistently all the way
5  down the highway, no.  That's asking for a ticket.
6      Q.  Right.  But it's fair to say you
7  exceeded the speed limit when you're behind on your
8  route.  Is that right?
9      A.  Yeah, to an extent, maybe 70.  Maybe
10  something like that on, you know, like, a Turnpike
11  or 295.
12     Q.  Okay.  So if the speed limit was 65,
13  you would never go faster than 70?
14     A.  I never said that.
15     Q.  Okay.  If you were late on your route,
16  how much above 65 would you go if you could
17  quantify that?
18     A.  I would go up to 70.
19     Q.  Nothing beyond?
20     A.  Like I said, if I was passing somebody
21  or something, yeah.
22     Q.  Okay.  And once you caught up with your
23  route, did you slow down again?
24     A.  Yeah.
25     Q.  Observe the speed limit?

Page 97

1      A.  Yeah.
2      Q.  Okay.  Have you tried to convince
3  anyone to join this suit?
4      A.  No.
5         MR. HERTZBERG:  We can mark this as the
6  next document.
7         (Exhibit JR-13, Timecard Report with
8         Notes, was marked for identification.)
9      Q.  I'm showing you exhibit JR-13, which is
10  titled, Timecard Report With Notes, date range of
11  4/27/2010 to 2/23/2013.  Do you recognize this
12  document?
13     A.  No.
14     Q.  Do you know what it is?
15     A.  I'm guessing it's a breakdown of my
16  hours, clocking in and out.
17     Q.  You see there's a code where it
18  says COJ001830?
19     A.  Okay.
20     Q.  Does that represent you?
21     A.  Yeah, I think so.
22     Q.  Okay.
23     A.  I can't remember what my, you know.
24     Q.  Does it correspond to the breakdown
25  that Steve sent you?



Page 98

1    A.  For my checks?
2    Q.  Yeah.
3    A.  Yeah.
4    Q.  Okay.  And you see on page three?
5    A.  Okay.
6    Q.  That's Bates number D000247.  At the
7  bottom it says: "Notes claims didn't take a break,
8  will be investigated."
9    A.  Okay.
10    Q.  Does that, in any way, refresh your
11  recollection as to the general time frame when you
12  first indicated that you didn't take a break,
13  sometime toward the end of 2010?
14    A.  Well, yeah, that's, you know,
15  basically, when I started getting -- getting the
16  idea of, like, you know, they don't like it when
17  you take a 30-minute lunch break and take a cooler
18  with you.
19    Q.  Okay.  So when you described your
20  initial conversation with Steve, you think it was
21  around that time?
22    A.  I would have to say yes.  I know it
23  was, from what I can remember, closer towards the
24  beginning of my employment than the end.  So that
25  would seem around that time frame.

Page 99

1    Q.  Talking ball park?
2    A.  Yeah.
3    Q.  Okay.  And if you go to page seven of
4  27, which is D000251, on the Bates stamp?
5    A.  Okay.
6    Q.  Do you see under Tuesday 4/12/2011?
7    A.  Okay.
8    Q.  There's an indication NL?
9    A.  All right.
10    Q.  Any idea what that reflects?
11    A.  I'm going to guess no lunch.
12    Q.  Well, does seeing that refresh your
13  recollection at all of any other occasion where you
14  advised Steve that you had skipped lunch?
15    A.  No.
16    Q.  Okay.
17    A.  Not that I can remember.
18    Q.  Just to the best of your memory.
19  Okay.  Turning to page 15, which is
20  D000259, do you see Friday, January 6, 2012 there's
21  another NL indication.  Do you see that?
22    A.  Yes.
23    Q.  Does that refresh your recollection
24  that in or around that time you advised Steve or
25  anyone that you had skipped lunch?

Page 100

1    A.  Yeah, I think I had to leave early that
2  day.  So I might have informed them prior to that I
3  wouldn't be stopping, taking a lunch because I had
4  something to do that day, so.
5    Q.  Do you remember who you advised of
6  that?
7    A.  No, I can't exactly remember.  I mean,
8  it was either, probably, Jeff or Steve.
9    Q.  Okay.  I'm looking at page 23, which is
10  D000267, October 6, 2012, there's also an
11  indication of NL.  Do you remember whether you
12  advised Steve or Jeff, at that time, that you had
13  skipped lunch?
14    A.  Yeah, probably one of them.  Again, I
15  left early.
16    Q.  Okay.
17    A.  Usually the only times I ever leave
18  early or not go to work probably had something to
19  do with a doctor's appointment with my son, so.
20    Q.  Okay.  And if you look at page 25 under
21  12/24/2012, there's also an NL designation, right?
22    A.  Right.
23    Q.  Do you recall contacting Steve or Jeff
24  about missing lunch?
25    A.  Not that day, I can't remember.

Page 101

1    Q.  Okay.  Did you ever have any
2  conversations with Leon Young while you were at
3  Empire?
4    A.  Not that I can remember, no, sir.
5    Q.  Other than Steve and Jeff, did you ever
6  have any conversations with any kind of management
7  representative at Empire?
8    A.  Not that I can remember, unless Bobby
9  Stickler or something, I think he might have been
10  in charge of maintenance for the vehicles.  I think
11  I might have had a couple of conversations to him
12  about problems with vehicles, that might have been
13  it.  So that's what I can remember.
14    Q.  Anyone else or that's all you can
15  remember?
16    A.  No.
17       MR. HERTZBERG:  Okay.  I'm done.
18       (Deposition was concluded at 1:40 p.m.)
19
20
21
22
23
24
25

**MAGNA** ◉
LEGAL SERVICES

Page 102

```
 1          CERTIFICATE
 2
 3       I HEREBY CERTIFY that the witness was duly
 4    sworn by me and that the deposition is a true
 5    record of the testimony by the witness.
 6
 7
 8
 9          Catherine Golembeski
            NJ-Certified Shorthand Reporter
10          Registered Professional Reporter
11
12
13
14
15
16
17       (The foregoing certification of
18    this transcript does not apply to any reproduction
19    of the same by any means, unless under the direct
20    control and/or supervision of the certifying
21    reporter.)
22
23
24
25
```

Page 103

```
 1          LAWYER'S NOTES
 2    PAGE  LINE
 3    ____  ____  _____
 4    ____  ____  _____
 5    ____  ____  _____
 6    ____  ____  _____
 7    ____  ____  _____
 8    ____  ____  _____
 9    ____  ____  _____
10    ____  ____  _____
11    ____  ____  _____
12    ____  ____  _____
13    ____  ____  _____
14    ____  ____  _____
15    ____  ____  _____
16    ____  ____  _____
17    ____  ____  _____
18    ____  ____  _____
19    ____  ____  _____
20    ____  ____  _____
21    ____  ____  _____
22    ____  ____  _____
23    ____  ____  _____
24    ____  ____  _____
25    ____  ____  _____
```

Page 1

**A**

**able** 20:6 30:14
  32:18 38:14
**absolutely** 52:18
**accepted** 74:20
**accident** 29:25 83:5
  84:11,22 86:10,12
  86:17 87:7 92:12
**accurate** 27:23
  68:12 76:23
**accurately** 26:23
  30:25 31:7
**action** 63:2
**actual** 26:12
**added** 82:16
**additional** 77:23
**adjust** 69:16
**adjusted** 15:20
  41:17 48:22
**adjusting** 38:22
  39:12
**adjustment** 48:17
  48:20 49:1 51:17
**adjustments** 69:16
  69:20
**administrative**
  30:21
**adp** 31:5
**advise** 48:12 69:13
  70:12
**advised** 17:10
  31:19 68:22 71:4
  99:14,24 100:5,12
**advising** 71:13
**afford** 16:14
**afternoon** 31:18
  32:18 37:18 44:22
  45:24 47:16 66:15
  69:15
**age** 11:21 13:12,18
  13:25
**ago** 19:20
**agree** 45:5 57:16
  67:25
**agreed** 5:2

**agreement** 51:25
**ahead** 85:23
**aint** 45:2
**air** 41:7,11 62:8
  67:17
**al** 1:11
**alert** 8:20
**allow** 7:16
**allowed** 15:4 36:19
  40:12 49:24
**altogether** 78:17
**amount** 9:16 14:1
  23:4
**angry** 51:6,7,8,10
  51:16
**annoyed** 51:15
**answer** 4:4 6:4,15
  7:2,4,16,21 20:7
  22:9 34:19 35:18
  54:1 60:13
**answering** 26:11,13
  26:15
**answers** 26:16,24
  27:3
**anybody** 35:7,15
  43:6 57:18 59:17
  84:3 94:9,11
**anyones** 7:11
**anyway** 28:21
  80:22 81:11,14
**apartment** 87:25
**apologize** 24:7
**apologized** 81:23
**appearances** 2:1
**apply** 102:18
**appointment**
  100:19
**appropriate** 48:17
**approved** 82:14
**area** 11:1,3 12:23
  34:25
**areas** 10:25
**argue** 32:6,7
**argued** 30:9 76:16
**asked** 59:16 67:14

81:1,4,7 82:3
  90:16 91:9
**asking** 6:6,8 35:25
  51:12 70:21 96:5
**associated** 58:19
**assumed** 84:1,25
  85:10
**assuming** 68:12
**assumption** 55:9
  84:1
**ate** 45:16,25
**atfault** 29:25
**attached** 72:20
**attempt** 33:23
  41:18
**attention** 72:23
  73:2
**attorney** 7:13
  26:19 58:18 89:5
  92:2 95:5
**attorneys** 92:1
**august** 77:20 79:9
**authorized** 41:24
**auto** 1:10 3:9,12
  12:14,25 19:5
  26:2 28:13
**automatic** 39:14
  40:9
**automatically**
  40:13
**available** 15:23
  16:15
**avenue** 1:17 2:9
**aware** 38:13 70:9
  84:5,12 85:10

---

**B**

**b** 3:6
**back** 6:16 10:9 13:2
  17:5 25:14 30:23
  31:17 32:3,15,16
  32:25 37:17,24,25
  44:1 45:1,13 46:1
  47:15 50:1,24
  51:2,4 65:1,6
  66:11,14 67:19,19

69:6 75:11 78:15
  78:16 79:6 80:14
  84:11 85:7 87:11
  88:7,17 93:22
  95:24
**ball** 7:3 16:3 99:1
**barely** 53:17
**based** 55:10
**basic** 9:14 10:17
**basically** 27:19
  32:1 35:3 39:23
  39:24 43:2 44:23
  45:10 54:6 55:5
  56:9 59:3 61:1
  63:15,16,23 72:20
  80:18,21 85:19
  86:16 89:3 90:15
  92:20 98:15
**basics** 10:20
**basis** 37:2
**bates** 98:6 99:4
**bealer** 34:7 36:25
  38:21,24 39:16
  42:18 46:18 47:4
  47:25 48:8 50:5
  50:10 57:22 58:15
  69:14,20 71:7
  74:3 79:24,25
  80:18 84:20 85:10
  85:16,21 86:5,14
  87:1
**beginning** 41:6
  98:24
**belief** 45:20 86:3
**believe** 23:23 26:23
  28:9 40:7 55:19
  63:19 67:16 70:19
  76:16,21 78:6,8
  78:17 91:18
**believed** 77:9
**believing** 55:18
**bellows** 8:25
**best** 20:4 48:15
  52:3 70:11,24
  71:4 80:16 81:15

99:18
**better** 39:18 46:19
**beyond** 96:19
**big** 16:3,5,25 17:1
  17:20
**bigger** 17:5
**bill** 71:25
**billows** 8:24 9:1,9
  9:11,20,24
**binder** 65:4,10
**birth** 8:1
**bit** 6:11 58:9 86:13
**bite** 37:18
**bits** 29:16,20
**blah** 58:11,11,11
**blow** 94:16
**blown** 8:17
**board** 73:22
**bobby** 101:8
**body** 12:15
**book** 6:23,24 29:16
**boss** 15:4,9
**bottle** 67:22
**bottled** 54:10 55:11
**bottom** 27:13 64:14
  67:4 72:24 98:7
**box** 12:19 29:7
  41:10
**branch** 84:22
**brand** 47:9
**break** 7:10 14:23
  15:1,3 17:8,11,13
  31:25 37:22 41:21
  42:10 44:14,17,19
  45:4 50:20 51:14
  56:15 69:7,22
  85:12 98:7,12,17
**breakdown** 20:16
  28:17 90:15 97:15
  97:24
**breaks** 29:22 30:10
  30:11 33:21 46:22
  70:3
**bridge** 78:16
**brief** 61:11,12



**bring** 34:10,17 36:5
42:25 43:2 48:1
54:17
**bringing** 55:4,14
**broad** 35:4
**brother** 60:2,7,10
**brought** 30:11
34:13 41:21
**bs** 56:9,14 57:9
59:5 61:1
**bucks** 65:17
**building** 10:20
17:20 88:3 91:6
**burlington** 89:2
**business** 60:9
**busy** 14:21 32:13

**C**

**c** 13:9 14:5,10
15:14,14 16:4
90:23
**calculated** 24:17
**calibrated** 76:24
**call** 31:20 38:9,19
38:21 39:3,9,11
39:18 43:21 48:23
48:25 50:23 69:14
69:15 70:5 71:8
80:10
**called** 31:13,19
37:5 51:11 63:1
69:21 75:4,12
80:15 82:2 87:21
**calling** 39:20 41:18
48:19,25
**calls** 47:8
**campus** 1:17 2:9
**cant** 10:3 13:6,10
18:17,22 19:12
22:1,11,20 23:17
23:19 29:15,23
34:19 35:18 36:11
40:23 53:11 54:8
54:12 56:14 58:1
62:5 63:8 66:3
72:22 77:6 80:2

81:18 93:21 97:23
100:7,25
**caption** 19:3
**car** 13:3
**carpet** 88:10,11
**cars** 22:3,3 84:7
**case** 1:3 20:10
21:20,25 23:5,24
27:1 45:1 47:8
50:7 65:6 86:6
87:13
**cases** 31:16
**cash** 85:3,7,12,18
86:20 87:4
**cashing** 85:3
**catherine** 1:18
102:9
**caught** 96:22
**cause** 68:2 71:23
**caused** 12:24
**cell** 71:25 72:1
**certain** 29:19 34:21
36:10 38:5 46:19
79:5 84:4
**certificate** 102:1
**certification** 5:4
27:6 102:17
**certified** 1:18
**certify** 102:3
**certifying** 102:20
**chance** 47:10
**change** 41:13,15
62:1
**charge** 38:22 84:21
101:10
**charged** 83:25
**check** 3:21 28:21
29:6,6 39:13
40:13 51:18 72:14
72:17,19 73:2
74:19 75:14,20,23
85:3,3,7,12,18
86:21 87:4 90:7
90:10 93:5 95:1
**checked** 29:7

**checking** 75:18
**checks** 98:1
**cheek** 48:22
**cherry** 2:4
**child** 90:19
**choice** 34:2
**choppy** 6:21
**chuckly** 93:12
**cigarettes** 79:2
**cinnaminson** 57:21
58:16 79:21 85:14
87:21
**circumstances** 46:3
71:22
**city** 46:22
**claimed** 34:22
**claims** 98:7
**clear** 45:20 53:19
66:10
**clearly** 49:2,9
85:13
**clip** 73:22
**clock** 31:6
**clocked** 84:3 85:1,2
85:6,15 86:20,20
**clocking** 87:3 97:16
**close** 9:6 34:4 52:4
60:9 61:16
**closed** 32:19 35:4
**closer** 25:2 98:23
**closing** 46:9
**code** 97:17
**coin** 84:23,24 86:15
**coj001830** 97:18
**cold** 16:12 67:22
**cologne** 22:11
34:20 58:14
**com** 1:24
**come** 51:8 53:5
60:25 66:13 78:16
78:16 92:8
**comes** 44:24
**comfort** 58:11
**comfortable** 27:12
**coming** 49:8 53:25

54:2 67:19 85:5
**commencing** 1:18
**comments** 74:24
**commercial** 17:20
88:10,11 91:6
**common** 17:25
**commonwealth**
82:23
**communicate** 68:6
68:13,24 69:10,10
72:2 75:8,10
80:24 81:2,5
**communicating**
70:3,8 75:19
80:20
**communication**
23:2 60:5
**companies** 10:4,6
13:8 14:4,6
**company** 8:19
11:19 12:22 16:3
16:7 20:19 24:24
35:22 40:15 56:2
63:24 67:1 70:7
70:12 71:1 84:25
85:9,11,18 86:23
87:10 91:2 92:17
**compared** 39:21
47:11,17 74:4
**compensating**
61:19
**complain** 48:7
**complained** 35:3
**complaining** 60:25
61:6
**complies** 18:9,14
25:21 27:14
**comprise** 25:19
**computer** 20:12
29:23 91:10,12,21
92:24
**concluded** 101:18
**conditioning** 41:7
41:11 62:8 67:17
**conditions** 83:11

83:13,21
**conducted** 40:5
**conference** 80:8,11
**conflict** 36:25 47:3
**confused** 75:18
**connection** 79:18
**consider** 6:1 45:3
88:2
**considered** 61:16
**considering** 91:17
**consistently** 96:4
**construction** 9:23
9:25 10:2,4,6,13
10:15,18 11:4,10
11:13,16,21 12:6
12:18,21,22,24
13:1,2,10,14,22
13:23 14:6 16:9
16:17 17:19 88:2
89:16
**contact** 22:16
**contacted** 91:23
94:1
**contacting** 100:23
**contacts** 93:22
**contempt** 27:24
**context** 53:5 67:10
**continue** 23:23
43:5 63:1
**continued** 62:10
85:8
**continuous** 13:15
**contract** 13:25
**contrary** 62:11
**control** 102:20
**conveniently** 91:4
**conversation** 32:21
39:16 48:23 50:13
51:5 56:23 57:5
57:16 61:2 63:5
68:21 80:7 81:17
81:22 92:9 98:20
**conversations**
52:25 53:24 60:21
101:2,6,11



convince 97:2
cooler 34:11,14,17
  36:5,12 43:2,25
  54:17 55:4,14
  62:3 98:17
cooperative 52:16
  91:13
copies 65:6
corporate 1:17 2:9
correct 16:17 24:2
  24:3 28:6,7 29:3
  51:22 68:15 70:25
  76:11
corrected 38:17
corrections 30:21
correctly 21:21
  59:15 87:1
correspond 97:24
couldnt 16:14
  89:10 93:9
counsel 5:3 93:1
  94:1
counsels 7:20
counted 64:25
counter 48:8
couple 46:16 47:16
  49:16,17 50:20
  56:20 65:16 67:23
  73:4 74:22,24
  79:1 80:24 91:5
  101:11
coupleminute
  80:25
course 10:11 32:10
  40:8 52:23 65:25
  67:19 70:17,20,25
  71:2,3 74:21,23
  78:24 85:1,11
court 1:1,19 6:1,11
  6:19 27:24 90:20
covered 30:16
criticism 41:1
criticisms 42:4,23
criticized 49:4
  50:23 53:18 62:4

current 21:10 93:1
  94:1
customer 32:19
  46:8 65:4 73:1
  75:16,23
customers 46:11
  65:7 72:16,19
cut 34:2 88:13 89:7

———— D ————
d 2:3 3:1 90:11
d000247 98:6
d000251 99:4
d000259 99:20
d000267 100:10
dalton 60:15
damages 23:4
dark 93:24
date 1:18 7:7 8:1
  20:18,18 78:10
  86:12 95:14 97:10
dated 64:8,12
  66:21 72:7,10
  73:12,14 76:3,5
  77:15,18 82:25
dates 13:6,10,11
davis 1:17 2:8
day 23:7 46:9 60:24
  61:18 62:6,7
  64:18 65:12,17
  78:6,21 79:4
  80:15 83:5 84:11
  85:4 100:2,4,25
days 24:20 37:19
  44:21 64:19 67:21
deal 42:10 79:3
  87:8
dealt 65:16 93:13
december 8:2
  72:10
decent 52:20
decided 15:13 46:4
  81:10
deducted 40:13
deduction 40:9
defendant 2:11 3:9

5:18 26:1
defendants 1:12
  3:10 25:11 26:22
  28:3
degrees 41:11
delays 32:12
delete 21:8
deleted 21:6
deliver 12:25
delivered 12:14
  17:18
deliveries 32:17
delivering 12:16,18
  47:6
delivery 13:8 77:21
  79:10 85:1
delran 8:6
demanding 47:21
demolition 10:18
  11:6
department 76:14
depending 12:23
  14:21
deposed 5:21
deposition 1:16 4:2
  5:19 94:6 95:6
  101:18 102:4
described 73:24
  98:19
description 3:7
designated 70:13
designation 100:21
detail 22:21 61:13
  61:21
determined 44:25
deviating 70:13,16
device 69:3 85:13
didnt 13:19 14:17
  15:15 16:1 19:17
  21:4 22:21 23:6,7
  24:19,23 25:8
  26:11,21 27:24
  28:20 29:5 32:6
  32:23 33:3,12
  34:17 35:1 36:1

36:17 38:7,10
  39:13,17 41:18
  43:16 44:10 48:6
  48:10,12 50:18,21
  51:16 54:11,20
  57:18 58:5 61:12
  61:15,25 62:15
  66:8 68:25 69:5,6
  69:25 70:5 72:1
  72:17 73:2 75:13
  76:13 78:22 80:23
  81:24 88:23 92:23
  93:24 94:10 98:7
  98:12
diem 14:8
difference 36:9
  51:3 81:11
different 11:4,5
  36:11 42:19 45:13
  46:25 59:3 95:24
differently 36:15
difficult 6:11 94:16
dimonte 56:5,7,18
  56:23 57:6 58:13
direct 102:19
direction 4:4
directly 91:6
disagree 55:15
disappeared 11:16
disciplinary 63:2
discipline 68:3
disciplined 36:10
  37:20 40:16,24
  49:4
discussed 40:10
  53:8 54:4 58:14
  74:1 75:7,9 95:5
discussion 52:11
  56:12 59:1,2
  67:11 74:6 77:1
discussions 61:10
  74:4
distance 36:8
district 1:1,2
dock 49:10

docked 35:17,21,23
  38:18 51:18 53:12
  53:15 61:17
doctor 88:22,24
doctors 100:19
document 18:24,25
  19:10,12,14,19
  24:2 25:13 26:9
  27:6 28:10 73:10
  73:14 74:12 76:1
  82:18 90:6 97:6
  97:12
documents 4:8
  25:18,20,22 94:8
  94:12,13
dodged 74:25
doesnt 27:2 32:8
  55:16
doing 5:24 7:5 9:11
  22:17 44:23 45:4
  46:19 50:11 63:18
  68:24 71:5 86:3
dont 7:1,1,2,7
  10:24 11:14 13:11
  17:4 18:10,23
  19:9,24 20:6,11
  20:22 21:9,19,24
  23:3 24:22 27:23
  30:16 35:15 36:3
  36:5 38:6,8 42:15
  44:12,24 45:2
  48:5 49:7,10
  50:24 51:2,3,7,9
  53:9 54:22 55:10
  56:25 58:10 60:24
  63:8,19 66:3 67:9
  68:19 69:1 70:19
  72:15 75:9 76:16
  76:21,22 78:13,19
  79:14 81:3 82:6
  89:4 91:11,18
  92:6,24 94:24
  98:16
door 35:4 36:12
  56:13 61:8



doubt 6:5
dozen 53:3
dozens 34:11
drink 41:9 67:20
  67:24
drinking 62:6
driven 13:12
driver 3:20 12:9
  14:3 45:18 57:25
  82:19,24
drivers 30:12 34:10
  34:13 35:5 42:10
  46:20,25 47:22
  49:6
driving 12:11,13,20
  13:14,23 14:7
  16:19 38:15 39:24
  41:25 47:5 55:5
  63:17 67:17 76:15
  83:10,21 95:17
drop 64:17 65:3,9
  73:21 74:9
dropped 73:18
  80:9
drove 37:24,25
  88:17
drywall 10:18 11:7
dubell 12:1,3
duly 5:9 102:3

E
e 3:1,6
earlier 43:9 54:4
early 37:9 100:1,15
  100:18
easier 65:7
east 2:3 91:3
eat 37:18 39:23
  43:2,4,25
eating 55:5 62:6
economy 11:15
education 8:7
effect 39:2 51:3
  82:7
effects 77:25
efforts 81:1

either 25:20 27:16
  32:13 48:12 52:7
  71:6 95:23 100:8
electric 8:24
electrical 10:19
elses 46:17 85:4
email 3:17 18:15,19
  74:13,15 75:3
  94:22
empire 1:10 3:9,12
  12:8,10,15 19:5
  20:15 21:11,16,22
  21:23,24 22:5,6
  24:24 25:5 26:2
  28:13 37:10 40:1
  51:22 55:20 58:19
  59:10,12,14,16
  60:6 62:11 66:1
  70:13 71:4 77:9
  79:17 84:6,21
  101:3,7
empires 60:22
employed 28:15
  37:3
employee 3:12,13
  3:14,15,16,18,19
  16:6 21:11,16
  22:5,6 29:11 31:1
  64:7,11 66:20
  72:6,10 73:11,15
  76:2,6,7 77:14,18
employees 16:6
employer 22:2
employment 21:19
  28:19 37:10 41:6
  41:14 63:6 90:21
  91:8 98:24
emsl 87:21
ended 48:25 51:25
enjoy 42:11
entire 19:17 29:15
  77:25
entitled 23:23
  35:24 40:20 73:15
envelope 64:18

65:3
especially 46:22
  62:7
esq 2:3,8
estimate 10:12 17:2
  30:3 52:25
estimation 7:3
et 1:11
event 6:24 7:19
except 6:24 7:7
eventually 62:13
  89:13 93:25
everybody 17:22
  17:24 36:1 45:13
  55:21 58:23 59:4
  59:8
everybodys 44:21
everyones 45:1
  47:12
exact 7:7 13:6,11
  18:25 19:12
exactly 22:1 35:11
  43:18 63:8 64:24
  65:15 66:4 77:6
  78:13 79:14 80:3
  81:16,20 100:7
examination 5:12
examined 5:10
example 14:10
exceeded 95:20
  96:7
exceeding 78:18
excessive 46:15
  66:25 68:7
exchange 3:20
  82:20,24
exchanged 20:23
excuse 93:17
exhibit 18:4 25:15
  26:10 29:11 64:6
  64:7 66:20 72:6
  73:11 74:13 76:2
  76:5 77:14,17
  82:19 90:7 97:7,9
experience 12:17
  47:4

experienced 22:23
explain 6:7 30:17
  61:5
explained 82:5
  84:10
explaining 81:25
extent 6:14 57:2
  61:20 95:19 96:9

F
fact 30:9 38:2 44:9
  44:12 51:8 53:11
  53:14 55:4 61:15
  68:1 76:17 77:9
  81:25 86:19
factor 33:14
factors 44:25
failed 68:9,13
failing 64:17 69:10
failure 68:6,23 75:8
  75:10
fair 45:3 46:2 54:5
  81:6 96:6
family 59:19,22,25
  59:25 61:10,21
  89:20
far 14:6 19:7 23:9
  23:16 27:15,16,18
  29:21 32:14 63:24
  75:17 78:18 90:18
  91:21 92:18
fast 76:15 83:10,21
faster 96:13
fault 86:10 92:13
  92:16
favor 92:18
fax 90:22 91:9
february 82:25
feel 21:4 27:2 36:22
  36:24 46:13,24
  47:21 52:16,19
  60:4
feeling 42:22
fellow 35:5
felt 36:14 42:12,18
  43:12 47:1 54:5

figure 57:4 59:7
  86:11 93:9
file 28:22
filed 19:23 20:3
filing 5:4 91:17
filled 20:2 91:20
filling 44:2
find 59:8 80:12
  92:3
fine 7:2,4,8 42:7
  89:9 95:2
fingers 94:17
finished 36:21
fired 62:10
first 3:11 10:3 16:6
  19:4,12,18 26:22
  27:5 28:3,14 30:6
  31:12,15 32:4,11
  34:3 38:3,9,12
  40:1,3 46:23
  50:12 51:11 58:10
  83:4 98:12
fit 13:14,16
five 24:20 41:23
  50:25
fix 39:6,20
fixed 39:7,19
fixtures 10:20
flip 18:10 84:23,24
  86:15
flipping 65:5,8
floor 1:17 2:9
flow 83:16,18 95:17
  95:22,24
focus 11:1,3 46:10
focused 24:16
focusing 50:12
  53:23
follow 95:17
following 6:20
  87:18 95:22
follows 5:10
foregoing 102:17
forgot 50:4 65:2,9
  71:24 72:17 73:21



MAGNA
LEGAL SERVICES

74:9
forklift 9:13
form 5:6
formal 7:15
former 21:11,16
  22:2,6
forth 6:16 10:10
  25:14
forward 53:4
found 75:20
four 10:7 16:5
  77:23
frame 98:11,25
framing 10:18
fred 15:10,18
free 53:22 54:6,22
freight 8:20
frequent 60:20,23
frequently 37:14
friday 99:20
friend 12:5
friends 59:19 61:21
  89:19
front 27:21 57:19
  94:14
frozen 67:22
full 8:17 10:24
fulltime 9:6,7 11:15
  13:20 14:2,3
  16:15,16
fully 23:6
furniture 12:16,17
further 8:7 63:2
future 78:1

### G

garfield 68:7
garnished 51:22
garnishment 52:1
  52:2,8 53:2,24
gary 12:1
general 36:18 37:1
  47:21 56:15 98:11
generally 7:14
  10:16,17 42:22
  72:13 79:1

generated 6:23
genuine 50:17
geotab 33:25 76:12
  76:23 77:2 85:13
getting 16:11 30:15
  32:16 33:4 35:17
  46:11 47:10 49:3
  50:22 51:12 61:21
  62:4 63:21,24
  65:1 85:9 91:13
  98:15,15
gift 61:7
give 42:19 51:8
  93:7
given 31:14 34:4
  46:14 64:11 75:17
  83:24
giving 7:3 80:5
  93:14
glued 88:11
go 9:22 11:17 14:2
  22:6 23:6 27:16
  27:18 44:1 45:25
  47:8,10,16 49:7
  57:15 60:24 61:12
  62:5 66:14 71:23
  76:18 85:2,18,23
  86:20 87:4 88:6
  92:23,25 93:11
  96:13,16,18 99:3
  100:18
goes 90:19 92:19
going 6:17,17,18,23
  7:15,21,24 14:1
  19:24 27:17 31:17
  32:16 33:2 38:14
  38:15,16 43:24
  46:5 47:17 48:25
  49:9,21 54:15
  57:12 59:22 61:25
  63:14,23 66:10
  69:23 70:16 71:2
  71:13 81:13 83:16
  83:18 87:8 90:9
  90:19,20 99:11

golembeski 1:18
  102:9
good 5:15 42:16
  47:6
governor 76:19
grab 37:18 41:9
  50:8 67:20 78:11
  82:1
grabbed 37:23
graduate 8:3,5,9
graduated 9:7
greenbaum 1:16
greenbaum 2:8
group 45:14 47:5
guess 7:1 18:16
  23:18 33:17 35:16
  35:18,25 40:25
  48:21 53:23 57:3
  57:14 58:11 62:13
  63:14 64:2 70:4
  75:17 80:8,10
  86:17 88:1 91:4
  95:15 99:11
guessing 97:15
guidance 7:20
guy 91:8 92:5,9
  93:4,7
guys 45:11

### H

h 3:6
half 14:14 15:4,25
  16:24 17:7 32:10
  35:11,17,23 36:11
  40:12,20 42:9,11
  43:6 44:10,14,17
  45:21 46:4,12
  51:1,14,19 53:3
  53:22 54:6,21
  69:24
halfway 37:11 63:7
handbook 3:12
  28:12,19,23 29:1
  29:2,11 30:1,2
handed 28:15
happen 6:17 42:8

45:6 62:16 63:24
  73:3
happened 33:16
  35:10 38:5 62:14
  67:16 73:20,23
  74:18 88:9,16
  89:10 91:22
happening 95:9
happy 87:6
harassed 56:17
havent 22:16 28:2
  44:22 75:22 77:7
  89:14,14
head 6:10 24:18
hear 35:5 85:20
heard 17:5 57:18
  60:10 75:22
held 1:16 27:23
  84:22
hell 7:16
help 18:17
helper 8:16
heres 93:20
hertzberg 2:8 3:4
  5:14,17 18:3
  25:10 27:10 29:9
  64:5 66:18 72:4
  73:9 74:11 75:25
  77:12 82:17 90:5
  97:5 101:17
hes 12:5 60:8 63:23
  92:14
high 8:3,6,9,13 9:6
  13:4
higher 47:9
highway 76:21 96:5
hill 2:4,4
hire 20:18
hired 89:21
holding 86:10
home 10:17 36:15
  36:17,20 50:8
  60:8,25 61:6 67:1
  68:2,7,14,17
  77:22 81:25

honest 65:11
hospital 88:18,23
hot 41:10 67:22
hour 14:14 15:4
  16:1,24 17:7
  32:10 35:17,23
  36:2 40:12,20
  42:9,11 43:6
  44:10,14,17 45:21
  46:4,12 51:1,14
  51:19 53:22 54:6
  54:21 69:24 76:22
  96:4
hours 14:2 15:21
  16:14 24:21 25:1
  33:11 38:17 53:14
  53:15,16,20 62:7
  67:23 97:16
house 10:21 30:7,8
  33:24 36:7 37:15
  49:13,21 63:15
  67:14 78:9 82:1
  91:7 92:25
hr 38:22 39:11,18
  39:20
hudson 91:3
hundred 65:16

### I

id 12:17 16:10,15
  20:6 37:11 61:3
  83:15
idea 47:6 88:16
  98:16 99:10
identification 18:5
  25:17 29:12 64:9
  66:22 72:8 73:13
  74:14 76:4 77:16
  82:21 90:8 97:8
identify 94:24
ill 6:7 36:16 89:18
  90:11
im 6:5,7,17 11:2
  13:13 15:4 19:24
  27:17,20 28:6
  31:17 32:16 35:25


MAGNA
LEGAL SERVICES

36:9 38:14,15,16
40:14 41:3 42:2
42:21 44:2,15
45:20 46:19 48:6
48:25 50:19 53:10
53:15,16,21 54:9
54:19 55:3,12,14
55:22 56:20 57:3
59:6,8,11 60:9
61:4 66:10 68:4
69:21 70:21 72:9
72:25 73:14 74:15
76:5 77:17 80:24
81:13,25 82:10,22
89:21 90:9 92:15
97:9,15 99:11
100:9 101:17
**imagine** 23:20
**immediately** 8:12
  41:22
**importance** 21:5
**important** 20:13
**impossible** 6:12
  31:17,25
**incident** 64:21
  74:18 77:21 78:1
  80:13
**incidents** 74:22
**included** 53:13
  72:21
**incorporated** 8:20
**incorrect** 87:10
**increase** 9:5,10
**index** 4:2
**indicate** 30:23
**indicated** 28:25
  98:12
**indicating** 75:4
**indication** 99:8,21
  100:11
**inform** 69:7
**informal** 5:25
**information** 91:10
  92:4
**informed** 69:6 71:1

100:2
**initial** 3:10 26:2
  94:20 98:20
**injured** 88:8
**installing** 10:19
  12:16
**insurance** 88:24
**intending** 22:24
**intention** 7:11
**interest** 22:2
**interpose** 7:13
**interpretation**
  50:14
**interrogatories**
  3:10,11 26:2,23
  28:4 94:21
**interrogatory**
  25:11,15,16
**interview** 5:24 40:4
  92:11
**investigated** 98:8
**irs** 52:5,12
**iselin** 1:17 2:10
**isnt** 68:11
**issue** 6:7 39:7 53:7
  58:4,15 72:1,14
  74:5 93:20
**issues** 53:6 58:20
  58:21
**ive** 12:11,14 13:11
  13:17 17:5 19:11
  19:13 20:23 22:16
  24:4,17 29:15,16
  29:18 30:1 32:7
  41:25 44:6 46:17
  62:13 64:11 71:1
  77:4 93:13

---

### J

**jackofall** 10:22
**january** 73:17
  99:20
**jason** 1:7,16 3:3,10
  5:9 25:12 26:3
  90:10,11
**jeff** 48:12 54:24,25

55:7,18 69:14,20
71:6 75:3 100:8
100:12,23 101:5
**jeffrey** 34:7 46:18
  47:3 50:10 57:22
  74:3 79:25 84:20
  85:10
**jersey** 1:2,18,20 2:4
  2:10 11:23 47:17
**job** 8:12,15 12:7
  13:20,23 87:15,20
  87:22,23 89:12
**jobs** 10:16 12:11,13
  12:20,21 13:8,14
  13:16 89:17,19
**join** 97:3
**jose** 22:11 34:20
  55:25 56:3 58:13
**jr1** 3:8 18:3,4,7
  24:2 27:7
**jr10** 3:19 77:14,17
**jr11** 3:20 82:19,23
**jr12** 3:21 90:7,9
  95:1,2
**jr13** 3:22 97:7,9
**jr2** 3:9 25:11,15,19
  27:8,9 94:20
**jr3** 3:12 29:9,11
**jr4** 3:13 64:7
**jr5** 3:14 66:20
**jr6** 3:15 72:6,9
**jr7** 3:16 73:11,14
**jr8** 3:17 74:13
**jr9** 3:18 76:2
**july** 1:14
**june** 8:11 74:16,16

---

### K

**keep** 6:18 31:4
  41:18 48:25 54:9
  55:10 61:25 63:20
  63:24
**keeps** 63:12
**kept** 12:4
**kicked** 76:19
**kids** 90:1

**kind** 9:12 11:16
  12:13,24 30:13
  31:17 39:5,16
  41:10 42:3,7 47:2
  50:17 54:12 61:12
  71:22 74:5 87:22
  87:24 94:15 101:6
**knew** 54:15 71:9
  90:19 91:7
**know** 6:6 7:1,3,4,7
  7:11 10:20 11:15
  11:22 13:20 15:3
  16:12 17:4,23
  18:7,18,23 19:9
  19:22 20:18 22:24
  23:4,8,9,10,16,21
  24:19,19,20 25:19
  25:24 26:6 27:12
  27:22,23 28:18
  29:14,21 30:9,9
  30:13,16,19 32:13
  32:19 33:12 34:16
  34:23 35:8,15,17
  35:20,24 36:1,3
  37:6,20,21 38:16
  38:19,21,22 39:11
  39:22,23 40:12,14
  40:19 41:5,23
  42:25 43:3,5,6,24
  44:8,9,12,18,19
  44:23,24,25 45:2
  45:3,5,23,24
  46:10,21 47:5,7
  49:4,7,7,20 50:6
  50:16,17,18,18,24
  51:7,9,12,13
  52:14 53:6,6,10
  53:15,17,19 54:18
  55:15,16 56:8,11
  56:16 57:17,19
  58:23 59:22 61:1
  61:19,20 62:15,25
  63:2,7,15 66:8
  68:18,25 69:1,18
  70:7,21,23 71:6

71:11,19 72:3,15
74:5,17 75:9,13
76:23 79:2,4 80:5
80:19,21,22 82:3
82:7,13 84:16,21
85:8 86:11 87:12
89:20 90:21 91:21
92:17 93:16 94:17
96:4,10 97:14,23
98:14,16,22
**knowing** 47:10
**knowledge** 10:25
**knows** 47:11 57:20

---

### L

**labeled** 40:11 41:3
  53:21,21 81:3
  88:1
**labor** 94:3
**laid** 11:18,20 16:12
**lane** 95:24
**late** 47:16 96:15
**law** 1:16
**laws** 94:3
**lawsuit** 22:15
**lawyer** 61:2,4 89:2
**lawyers** 91:23
  103:1
**leave** 9:4,24 11:12
  13:23 20:18 43:4
  50:6 100:1,17
**leaving** 8:13 67:19
  71:10
**ledger** 90:22
**left** 11:9 12:6 16:8
  21:22,24 72:18
  82:4 87:15 89:1
  100:15
**leg** 88:15
**legal** 1:23
**length** 37:22 57:1
  77:25
**leon** 101:2
**letter** 85:25
**level** 23:20
**leveled** 42:4



license 50:4,6
life 42:1 59:23
    60:25
light 88:2
liked 82:11
limit 95:20,20 96:7
    96:12,25
lindsay 15:10,12,18
    17:17
line 4:5,5,5,9,9,9,13
    4:13,13 43:1
    103:2
lines 75:10
list 29:7
literally 79:5
little 6:10 46:15
    51:15 58:9 60:10
    86:13 88:13
live 60:7,16
living 78:10 91:3
llc 2:2 90:23
llp 1:17 2:8
load 45:25 56:13
loading 44:1 85:8
located 11:22
location 29:24
    36:10,18 70:8
    72:19 85:14
log 77:21 79:10
long 8:21 9:15,19
    14:13 16:23 37:13
    52:2 54:10 56:12
    70:1 81:4 82:4
    87:17 88:4
longer 21:1
look 18:6,12 19:3
    25:18 26:9 27:11
    28:12 29:13
    100:20
looked 94:18
looking 26:1 75:11
    89:22 92:20 100:9
looks 18:15
lose 42:6
loss 42:2

lost 47:10
lot 31:16 32:13
    48:14 87:14
lower 88:21
lumbar 88:20,21
lunch 14:11,23
    15:1,3,5,14,15
    16:1,21 17:8,11
    17:13,22,23 18:1
    23:7 24:20 25:8
    30:13,14 31:9,12
    31:14,14,20,25
    32:3,10,16,23,25
    33:3,9,13,19,21
    34:4,18,22 35:23
    36:2 37:7,16,22
    38:3,11,14,16,25
    39:5,6,8,13,17,23
    40:10,12,16,18,20
    41:20 42:11,13,14
    42:18,24 43:16,20
    43:21 44:4,10
    45:10,12,21 48:12
    48:16,20,24 49:3
    49:6,12 50:14,24
    51:13,17,20 53:7
    53:11,13 54:17
    55:16 58:4,15,20
    58:21 60:6,22
    61:16,18,20 62:2
    66:12,14 69:8,11
    69:12,23,24 71:19
    74:5 78:22,22
    80:21 82:15 85:2
    85:12 86:20 87:4
    98:17 99:11,14,25
    100:3,13,24
lunches 53:17 59:5
    62:11 63:10 93:19

────────────
        M
────────────
m 1:18 101:18
machine 91:9
magna 1:23
magnals 1:24
main 84:22

maintenance 87:23
    87:24 88:1,3
    101:10
making 46:11
    51:25 77:20 79:9
    80:19,24
management 52:7
    57:20,21 65:18
    67:6 85:17 101:6
manager 58:1
manner 62:11
mark 18:3 25:10,13
    29:9 64:5 66:18
    72:4 73:9 74:11
    75:25 77:12 82:17
    90:5 97:5
marked 18:4 25:17
    29:12 64:8 66:8
    66:21 72:7 73:12
    74:14 76:4 77:16
    82:20,23 90:8
    97:8
marlton 2:3
married 89:24
martha 28:15
    40:21 57:24 58:3
matter 5:18 6:25
    36:17 93:2
matthew 2:3
max 44:3
maximum 76:18
mcdonalds 36:7
    50:2
meal 29:22 30:4
    35:14
mean 13:24 16:13
    18:22 23:16,21
    24:17 29:5 32:7
    34:19,20 35:22
    37:21 38:14 40:11
    41:17,24 42:6
    43:17 44:9 46:6
    47:2,14 48:6,20
    49:7,22 50:9,16
    51:11 53:16 54:8

54:15 55:12 57:24
    59:21 60:23 62:5
    65:15 67:21 69:24
    70:4,16 72:20
    76:16 77:4 80:2
    81:23 82:12 83:24
    83:25 84:1 87:12
    91:25 92:22 93:10
    93:12 94:7,8,17
    95:8,18 100:7
meaning 59:17
means 88:21
    102:19
meant 42:24 43:9
    46:8 63:22 66:9
mechanic 8:16
mechanical 12:15
meet 79:17 94:9,10
meeting 35:4,9
    79:20
melted 67:23
members 59:25
memo 72:21
memory 99:18
mention 24:1
mentioned 14:4
    37:5 42:17
message 42:19
    43:12
met 5:18
metro 1:17 2:9
middle 56:12 75:2
mike 56:5,7 58:13
miles 33:24 76:22
    96:4
miller 2:3 18:10,17
    22:10 27:9 60:14
    89:4,9 95:10
milligan 28:16
    40:21 57:24 58:3
mind 6:5
minded 35:16
mine 12:5 46:17
minimum 6:19
minute 41:23 44:18

minutes 31:14 34:1
    34:24 38:18 44:3
    44:8 49:4,11,25
    50:21,25 53:19
    56:16 61:17,19
    69:18 78:13,18
    82:16 83:15 85:7
missing 48:16
    100:24
mistake 65:11
mistaken 28:16
    78:7 86:3
misused 85:18
mom 60:2
moms 37:15 49:13
    49:21
money 9:25 38:23
    53:6 64:18,19,25
    65:9,14 74:8
    78:22 80:10
monies 23:22 73:17
month 52:13
months 19:20
    47:14 56:20 87:19
    90:17
morning 5:15,16
    51:2 66:14
moskal 2:14 31:22
    32:21 37:6 38:2,9
    38:19 39:3,9 48:4
    51:5 80:4 81:16
    86:1
mother 90:18
mothers 30:7 78:8
    82:1
motor 8:20
moved 91:6
mri 88:23

────────────
        N
────────────
n 3:1
name 5:17 8:18
    11:19 12:2 15:11
    19:4 22:8,12
    28:16 58:2 60:12
    90:10 92:7



names 13:7
naturally 59:21
  74:7
nature 7:15 22:24
  32:20 41:15
near 37:22 76:22
  88:12
necessarily 19:13
  32:24 33:1,10
  35:6
need 7:10 21:4
  80:23
needed 12:23 14:8
  49:1 69:17 79:3
  88:22
never 15:6 21:22
  28:23 29:18 33:18
  34:1 38:5 40:15
  42:1 44:13,16
  45:21 53:7,12
  69:8 70:25 71:1
  82:8,10,12,13,14
  85:24 93:10 96:3
  96:13,14
new 1:2,17,19 2:4
  2:10 11:21,21,23
  13:12,12,18,18,25
  13:25 47:9 75:23
nine 19:20 62:7
njcertified 102:9
nl 99:8,21 100:11
  100:21
nodding 6:10
nods 6:12
nonexempt 31:1
notary 1:19
notes 3:22 97:8,10
  98:7 103:1
notice 1:16 3:13,14
  3:15,16,18,19,20
  64:8,12 66:21
  72:7,10,18 73:12
  73:16 76:3,6
  77:15,18 79:18
  81:8 82:19,24

83:20
notify 68:9
november 77:18,23
  78:1
number 1:3 27:8
  98:6

_____

O
oath 5:25
objection 7:14
objections 5:5 7:14
  7:18
observe 96:25
obviously 8:16
  33:13 34:25
occasion 61:22
  74:9 99:13
occasional 89:16
october 76:6
  100:10
octoberish 16:11
offered 13:20
office 2:4 68:7 80:6
  80:15 87:25 88:17
  88:25
officer 92:15
offices 1:16
oh 41:19 48:9 49:5
  49:9,23 61:4 88:6
okay 5:20,23 6:9,22
  7:6,9,17,22,23 8:1
  8:3 9:2,9 10:1,5,8
  10:11,15 11:9,12
  12:6,9 13:5 14:3
  14:13,15,19 15:6
  15:13 16:8,16,25
  17:7,25 18:6 19:2
  19:14 21:3,6,21
  22:8 23:14 24:6,9
  24:11 25:4 26:1,4
  26:8 27:5,17,20
  28:1,9,12,24 29:4
  29:8 30:18,23
  31:4,9,19,22
  33:18,21 34:16
  36:4 37:14 40:8

40:14 41:12 42:3
  42:5,20,21 43:14
  43:15,23 45:15
  46:2,21 47:20,25
  48:3,9 50:12
  51:21 52:16 53:11
  53:22 54:14 55:14
  55:22 56:22 57:11
  59:13,24 64:13
  66:10,17 69:4
  70:2,11,21 71:12
  71:17 72:9 73:8
  74:15,21 75:15,19
  75:25 76:5 77:12
  77:17 78:5 79:22
  80:6 81:19 82:22
  83:1,9,20 84:9
  86:22 87:5 88:6
  89:6,16,22 92:12
  93:4,23,25 95:3,8
  95:16 96:12,15,22
  97:2,17,19,22
  98:4,5,9,19 99:3,5
  99:7,16,19 100:9
  100:16,20 101:1
  101:17
old 60:18
once 37:1 49:12
  56:14 67:15 73:3
  73:6,7 77:8 89:18
  96:22
oneday 78:2
ones 45:4 94:18
opinion 35:8
order 88:23 91:10
orders 9:14
orientation 40:2,6
  40:9,18,22
original 95:14
ot 51:12,16
outfit 10:1 11:17
  16:25
outgoing 93:12
outside 41:11
outspoken 55:17

overtime 15:22,23
  15:25 24:21,23
  25:4 32:22 33:3,4
  33:8,14 53:7,13
  53:16,16,20
owed 23:9,17 33:8

_____

P
p 101:18
pa 47:17 83:5
pack 30:12 49:6
  61:18 62:2
packed 44:7
packing 39:22
packs 79:3
page 3:7 4:5,5,5,9,9
  4:9,13,13,13 19:4
  19:12 24:8 27:6,9
  30:4,20 57:17
  64:15 75:3 83:8
  98:4 99:3,19
  100:9,20 103:2
pages 30:1
paid 13:24 25:4
  32:22 33:3,4
  51:12,16 71:25
painting 10:19 11:7
paper 26:13 27:15
  27:19,22 28:14,22
  72:21
paperwork 26:12
  44:2 52:14 64:25
  65:10 80:9
paragraph 24:10
park 2:4 7:4 16:3
  99:1
part 20:20 26:9
  27:2,8 55:9 77:24
  78:23 82:5 86:12
  88:15
participate 40:21
particular 11:1,3
  34:25 59:1 85:4
partk 3:12
parts 1:10 3:9 11:8
  12:14,15,16,25

17:18 19:5 26:2
  44:21 45:2,23
  46:10,11 65:7
parttime 13:3 14:7
passed 70:5 76:21
passing 95:23
  96:20
pay 9:5,10 15:22,25
  20:17 23:6 30:21
  42:7 48:17,21
  49:10 52:12 72:23
  73:2 90:16 95:1
payments 41:14
  72:14 73:21
pennsauken 13:11
pennsylvania 82:24
people 17:3 21:18
  22:4 35:19,20
  39:22 43:19,24
  44:10 46:18 47:5
  47:7 59:8,11,16
  66:12 68:24 84:7
  93:10
percent 34:15,17
  55:13
perfectly 7:2
period 29:22 36:8
  49:24 61:17 63:18
  81:4
periodically 78:25
permanent 89:15
person 22:4 48:7
  54:9 57:25 59:1
  93:12
personal 20:11
  74:19 75:14,18,20
  75:23 85:6 91:11
  92:24
personality 36:25
  47:3 55:10
personally 23:5
  35:6,7 73:16
personnel 79:17
persons 47:8
phase 11:21 13:2



13:12,18,25
philly 32:14
phone 20:5,6,9,10
    20:12,14 21:1,14
    48:23,25 61:2,4
    71:25 72:1,3
    94:14,16,23
photocopied 29:17
    29:21
picked 82:4
pieced 29:16
pieces 29:17,20
pike 2:3
pinpoint 54:19
pinpointed 53:13
place 14:17 17:25
    41:22,23 52:3
    63:6 79:20 80:7
    85:3 87:21
plaintiff 1:8 2:5
plaintiffs 3:10
    26:21 28:3
please 6:6 18:6
    25:14,18 26:8
    29:10,13 64:6
    66:19 72:5,20,23
    73:10 74:12 76:1
    77:13 82:18 90:6
plumbing 10:20
plus 10:14 23:10
point 21:15 32:7
    70:2
police 76:13 83:17
    92:15
policy 29:25 34:18
    35:14 60:6,22
    62:11 63:24 70:8
    70:12,15,22 75:21
    75:23 84:5
popped 88:15
portion 18:7
position 33:7 42:1
positive 55:13
practice 62:10
    95:16

practices 30:5
preferably 31:15
prepaid 72:2
prepare 94:5
present 2:13 21:16
    80:4
presented 29:18
preserve 7:15
pressure 42:13,14
    46:20
pretty 10:9,14,21
    10:22 13:21,24
    16:12 17:1 19:11
    20:7,19 30:11
    32:6,13 34:9
    45:25 55:3 56:19
    57:15 60:9 72:18
    88:17 89:1 92:10
    92:11 93:12,17,18
previous 78:9
print 91:11
prior 22:7 24:18
    50:10 65:1 71:10
    81:7 91:8 95:14
    100:2
privilege 7:19
privileges 75:17
probably 9:16
    13:18 16:11 22:21
    23:25 32:18 39:21
    41:7 52:4 55:21
    57:18 58:23 66:7
    67:18 73:1,7
    100:8,14,18
problem 32:9
    39:21 47:13 68:16
    68:23 71:16 73:5
problems 35:14
    90:18 101:12
process 63:20
product 47:6
production 4:8
professional 1:19
    102:10
pronounced 22:12

property 85:18
public 1:19
pull 36:6
pulling 9:13 88:10
pursuant 1:16
pursue 93:24
pursued 89:11 94:4
pursuing 22:25
put 7:12 29:18 30:2
    46:17 65:2 83:20
    87:9 92:4
putting 91:22

Q
quantify 45:7
    96:17
quest 13:3
question 5:6 7:21
    54:1
questioned 77:2
questioning 22:23
questions 6:4 7:23
    25:11,13,15 26:14
    26:16,24
quick 35:4 37:18
    43:4 44:7 50:8
    78:11
quiet 61:3
quite 10:4

R
raining 83:15
raise 9:8,9
raises 9:6
range 23:9 97:10
rate 53:20
reacted 55:13
read 19:14,16,17
    24:1 25:25 26:12
    27:17,25 28:2,8
    68:5 74:17 94:2
reading 24:13,18
    27:12 94:13
reads 77:19
real 43:4 44:7 50:8
realized 65:9

really 16:14 20:11
    21:4 22:1,17,20
    23:17 24:21 30:17
    35:16,16 37:12
    39:6 40:23 42:15
    42:19,24 43:16
    48:5,6 49:8 51:9
    53:4,9 56:25 58:1
    58:6 60:8 63:8
    65:20 70:19 72:22
    75:14 78:19 80:23
    81:24 82:8,12,13
    82:14 86:18 87:13
    93:24 94:10 96:3
rearended 29:24
    58:8 84:7
reason 68:11
reasonable 31:18
recall 37:7 40:22
    68:21 69:1 71:13
    72:13 78:3,5 80:3
    100:23
receive 28:21 29:2
    48:16 66:1 76:13
received 19:18
    23:22 25:24 28:23
    28:25 48:22 85:24
    92:22
receiving 41:12
    51:17
recess 64:10
recognize 65:13,18
    67:6,9 90:11
    97:11
recollect 54:13
recollection 20:4
    38:6,8 48:15 52:3
    55:6 57:5 67:13
    70:12,24 71:4
    80:17 81:15 98:11
    99:13,23
record 6:21 7:16
    102:5
recorded 37:21
recording 30:25

reed 1:7,16 3:3,10
    5:9,15 25:12 26:3
    90:11
reeds 25:12
refer 25:14
referral 88:22
referred 6:25 92:19
referring 26:5
reflect 26:24 27:3
    31:10
reflecting 30:4
reflects 99:10
refresh 98:10 99:12
    99:23
refueling 41:10
regarding 7:18
    20:15 68:7 77:22
regardless 20:19
regards 68:1 73:17
    76:10
registered 1:19
    102:10
regular 88:22
related 20:9
relating 77:21 79:9
relation 21:20
    84:17
relationship 52:20
relatively 37:9
relevant 59:10
remarks 68:1,5,12
    77:19
remember 6:15
    10:3 11:19,24
    13:6,7,10,11
    18:19 19:2,18
    20:20,23 22:1,11
    22:21 23:1,3
    24:12 26:11,13,15
    29:19,23 30:20
    32:2,5 33:2 35:10
    38:4 40:5,23
    42:17 45:15 48:5
    48:18 53:9,25
    54:1,8,22,24 55:2



55:23 56:3,6,18
56:25 58:1,5,17
58:25 60:20 63:8
64:21 65:14,22
66:4,23 67:10
72:11,15 74:1,8
77:1,6 78:14,20
78:23 79:8,12,14
79:15 80:1,3
81:18,19,21,24
82:5,6 92:6 93:21
94:18 97:23 98:23
99:17 100:5,7,11
100:25 101:4,8,13
101:15
**renamed** 34:9
**renovations** 87:25
**rephrase** 6:7
**report** 3:20,22
15:14,17 38:21
48:16 82:20,24
97:7,10
**reported** 26:19
38:2
**reporter** 1:19,19
6:11,20 102:9,10
102:21
**reporting** 76:23
**represent** 5:18 93:1
97:20
**representation**
92:21
**representative**
101:7
**representing** 2:5
2:11
**reproduction**
102:18
**request** 4:8
**required** 28:18
**reserve** 84:6
**reserved** 5:7
**residence** 78:9
**response** 15:19
49:5 71:12

**responses** 3:10
25:12,16 26:12,22
27:16,18,21 28:3
**responsibility** 31:1
**responsible** 84:22
**rest** 19:9,11 30:4
38:15 63:16,17
**resting** 29:22
**result** 78:1
**retire** 57:12
**retired** 56:20,24
**retirement** 57:13
**returning** 51:4
**revert** 65:6
**reverted** 87:11
**review** 94:8,12
**richard** 2:8 5:17
**rid** 93:18
**right** 6:2,13 8:18
9:19 14:10 18:25
19:10 20:7 25:8,9
26:25 27:10 28:10
29:2 33:5,9,16
36:21 37:5 44:1
45:17 48:13,14
54:23 59:6 60:12
61:14,23 64:4
65:8 66:13,15
68:8,15 69:25
70:18 71:5 72:24
72:25 75:1 81:12
81:13 84:6 86:25
87:8 88:15,17
89:7,21 93:24
94:1,2 96:6,8 99:9
100:21,22
**ringer** 7:12
**riverside** 11:23
13:9
**road** 36:6 42:10
**room** 79:25 80:4,9
80:9,11
**route** 31:18 32:4,11
32:12 37:18 41:8
46:9 47:7,11,12

47:21 48:9 50:1
51:2 69:15 70:14
71:14,23 75:16
78:19 85:1,12
96:2,8,15,23
**routes** 46:7,13,19
46:24 47:22 66:13
78:24 79:5
**routine** 41:14
**routinely** 24:25
**rowe** 1:17 2:8
**run** 31:16 32:12
59:4
**running** 47:23
**runs** 43:20 74:16
**rush** 65:11
**rushed** 92:25

_____
         **S**
**s** 3:6,9 26:2
**sacrifice** 71:20
**safe** 73:18,22 74:9
**salary** 41:15 42:6
**sambe** 13:10 14:5
16:17,25 17:14,16
**sample** 18:21
**sandwich** 78:12
82:2
**sat** 44:6,20 51:1
**save** 20:13,14 21:5
21:9
**saved** 20:5,8,22
21:14
**saw** 18:24 19:9,15
26:6,24 28:9 30:4
**saying** 27:20 28:6,7
32:2,5 33:2,15,18
39:23,25 42:24
43:10 44:16 48:19
49:9 55:14,23
56:3,6,8 59:7,10
59:11 72:25 78:20
82:6
**says** 21:7 26:13
27:6 30:21,25
64:17,24 66:25

68:5,8 72:23
73:16,18 75:5
83:8,10 90:9,23
90:23 92:13 97:18
98:7
**schedule** 77:24
**school** 8:3,6,10,13
9:7 13:4
**schools** 17:19
**sealing** 5:4
**second** 26:9 31:16
75:2
**see** 6:10 23:17,19
24:12 26:21 30:24
31:2 36:5,11
43:19,24 51:2,3
64:17 66:25 72:20
73:18 74:21,23
75:2,4 76:10
80:23 83:4,7,12
90:20,23 93:5,22
94:3 97:17 98:4
99:6,20,21
**seeing** 18:19 19:2
30:20 99:12
**seek** 7:19
**seeking** 23:5
**seen** 18:7,18 19:7
19:11,13 25:19
26:10 29:14,15,16
29:18 30:1 77:7
83:2
**sense** 16:13 30:12
**sent** 43:12 97:25
**separate** 25:22
**september** 87:18
**series** 10:6
**serious** 74:6
**served** 93:10
**services** 1:23
**session** 5:24
**set** 3:11 26:22 28:3
36:8 47:18 52:13
**sets** 69:14
**setting** 5:25

**seven** 24:8 78:13
87:19 99:3
**shared** 22:2
**shelves** 9:13
**shocked** 54:12
**shooken** 58:9
**shop** 33:25 37:25
50:1 51:4 65:1
71:10 78:15
**shops** 78:25
**short** 34:2 70:10
81:2,3
**shorthand** 102:9
**shortly** 56:23 57:12
**shot** 93:23
**shouldnt** 42:25
**show** 85:13 90:9
**showed** 44:22 46:9
**showing** 72:9 73:14
74:15 76:5 77:17
82:22 97:9
**shown** 29:21,23
30:24
**shrugs** 6:12
**shut** 72:3
**sicker** 28:10
**side** 36:6 89:18
**sides** 57:19
**sign** 27:19 31:5
72:17
**signature** 64:14
65:19 67:4,8 73:1
76:7,8 77:5
**signatures** 65:4
67:7
**signed** 28:14 76:25
**significant** 9:5 14:1
68:23
**signing** 5:3 27:13
**similar** 18:15,20
**simmons** 29:24
**simple** 53:14
**single** 23:7
**singled** 36:22
**sir** 101:4



sisters 60:2
sit 43:25
site 92:19,23
sites 17:19
sitting 28:2 33:7
    46:12
situation 36:14
    86:2
situations 38:20
    95:21
six 47:14
skimmed 19:16
    24:4,16 94:21
skip 31:9
skipped 31:12,20
    48:11 99:14,25
    100:13
skipping 51:13
slow 96:23
slowed 11:14 16:10
smith 1:17 2:8
smoke 78:15,25
socialize 45:11
society 2:4
solid 56:16
solidly 89:21
somebody 39:12
    47:9,11 53:10
    54:11,12 71:6
    76:21 85:4 93:22
    96:20
somewhat 24:14
    36:23 67:12 78:4
    83:14
son 100:19
sons 90:18
sooner 37:12 87:14
sorry 11:2 44:15
    58:24 68:4 81:25
    82:10
sort 23:1 36:14
    40:2 42:12 43:11
    63:19 73:23 87:2
sound 57:19
sounded 50:16

sounds 93:20
south 1:17 2:9
spackling 10:19
    11:7
speak 6:17,18 48:3
    95:5,13
special 75:17
specific 14:17 55:6
    57:4 58:25
specifically 55:8
speed 76:18 84:4
    95:20,20 96:1,7
    96:12,25
speeding 76:10
    77:10 92:13
spell 12:2 15:11
    22:12
spending 34:21
spent 36:18 61:6
    68:20
spoke 31:21 35:8
    58:19 60:1 91:16
    95:10
spoken 35:6 50:10
    73:5
staff 77:25
stamp 99:4
standpoint 93:4
start 39:22 81:16
started 13:22 16:7
    40:1 98:15
starting 28:18
starts 16:11
state 1:19 36:16
    93:12
states 1:1
stayed 16:13 46:3
    85:14
steel 41:10
step 88:13
stepfather 60:3,8
steve 2:14 20:21
    31:21,22 40:7
    48:3,12,19 50:13
    52:8,21 53:1 54:7

54:20 62:24 63:11
    65:20,23 75:3
    79:19,23 80:4,18
    81:16 86:1 90:16
    91:13,16 97:25
    98:20 99:14,24
    100:8,12,23 101:5
steven 74:3
steves 67:9
stickler 101:9
stipulated 5:2
stipulations 4:12
stocking 9:13
stop 6:6 34:10,21
    36:20 37:17 38:15
    43:4 50:8 56:14
    63:14,16 65:2
    67:20 70:10 71:25
    78:25 82:14
stopped 37:15 50:2
    50:25 63:15,16,18
    67:14,18 68:2
    70:2 78:8,11,21
stopping 30:7
    38:13 50:19 53:18
    68:13 77:22 80:23
    81:25 82:1 100:3
stops 32:14 41:4,8
    41:24 46:16 47:17
    47:18 50:20,25
    63:1,10 67:1 68:7
    68:17,22 77:20,23
    78:14 79:9 80:19
    80:25 81:2,4
store 41:9
straight 12:19 53:4
    85:16
strain 88:21
strand 88:12
strange 86:13
straw 87:2
street 91:7
stress 41:19
stressed 32:25
strike 52:24 74:22

84:12 93:6
stubs 20:17 23:6
    90:16 95:1
stuff 12:19 20:17
    41:25 42:25 50:9
    52:14 54:9 62:15
    63:14 65:2,6
    80:20 91:20 93:11
    94:15,16
subject 52:10
substance 95:8
successful 22:17
suggested 15:20
suing 25:7
suit 19:23 20:3
    91:17 97:3
suite 2:4
summer 41:7
summons 3:8 18:4
supervision 102:20
supervisor 11:24
supervisors 68:6
supplies 12:18
    17:19
supply 8:24 13:9
    14:5,10 16:4
    90:23
support 4:2 90:19
supposed 14:15
supposedly 35:24
sure 6:3 18:22
    27:22 46:11 48:24
    49:2 55:3
suspended 62:18
    63:12
suspension 62:21
    63:3 78:2
suspensions 62:14
swartz 2:2
swidler 2:2
switch 48:10
switched 47:1,13
    47:15,19
sworn 5:9 102:4

_____
     T
_____

t 3:6
take 5:19 6:12 7:10
    7:10 8:12,15 12:7
    14:16,17,19,22
    15:1,6,13,15 16:1
    17:11,13,16,22,23
    18:1,6,8,12 23:7
    24:20 25:8,18,23
    26:8 27:11 29:13
    30:11,14 31:14,25
    32:3,15,23,25
    33:3,22,23 36:1
    37:15 38:11,13,16
    39:5,8,17,18
    40:17 41:19,20
    42:13,14,18,24
    43:15 44:4,10
    45:9 48:24 49:2
    49:12 50:13,20,23
    51:13,14 53:11
    56:15 62:2 63:5
    63:17 69:12,23
    71:18 72:17 79:20
    80:7 87:15 89:12
    98:7,12,17,17
taken 1:16 44:18
    46:16 63:3
takes 46:21
talk 39:12 52:6,7
    58:3,6,7 59:22
    61:3
talked 22:14,18
    59:7 66:11 77:24
    89:2,4
talking 36:13 40:25
    44:2 59:24 65:14
    65:22 66:13 99:1
tell 5:23 14:22,25
    31:24 32:22 33:25
    35:2,13 38:10,24
    39:10,17 43:7
    54:6,20 62:9
    73:20 80:16 83:17
    86:5
telling 50:15 54:24



MAGNA ▶
LEGAL SERVICES

55:2,7 63:20 87:1
  95:4
**terminate** 84:6
**terminated** 35:12
  56:1 62:1,17
  63:10,13 84:14,15
  84:16,19,24,24
  86:13 87:14 90:17
**terminating** 85:17
**termination** 63:4
  78:2 85:24
**terms** 6:16 41:12
  63:12
**testified** 5:10
**testimony** 3:3
  44:13 102:5
**texted** 21:17,22
  22:4,19
**texts** 20:21,23,25
  21:7,10,12,15
**thanksgiving** 78:7
  78:21
**thats** 7:2,4 20:4,13
  22:12 23:20 24:5
  24:7 26:5,9 27:19
  28:22 33:15 42:16
  42:21 43:5,9,11
  44:25 47:2,18
  48:14,24 50:17
  53:19 59:6 63:16
  63:22 72:21,25
  75:20 80:10 86:13
  89:7,9,20 91:2
  93:9 94:15 95:11
  96:5 98:6,14
  101:13,14
**theory** 55:16
**theres** 6:5,6 19:4
  25:22 27:6 44:20
  45:1 50:9 74:22
  74:24 75:3 87:11
  90:22 97:17 99:8
  99:20 100:10,21
**theyre** 11:22 13:9
  17:1,5 21:1 85:5

86:9 90:20
**theyve** 35:13
**thing** 19:17 27:18
  44:7 45:14 64:1
  86:17 87:7 93:19
**things** 11:4,5 28:18
  55:11,22 59:4
**think** 11:9 13:3
  14:14 20:25 21:17
  21:19,25 22:22
  23:15 24:15,22,25
  28:16,17 29:22
  30:3,6,7,10 34:20
  38:12 39:15 41:2
  46:23 49:22 52:2
  52:22 54:25 56:1
  56:22 57:11,25
  63:8 65:20 66:4
  67:8,18 68:19,19
  70:15 74:3 77:11
  78:8 79:24 80:2
  81:3 91:22 97:21
  98:20 100:1 101:9
  101:10
**thought** 46:15
  54:20 81:11 86:2
  86:23 93:17,23
**thread** 3:17 74:13
  74:15,24
**threat** 63:13
**threatened** 62:20
  62:23,25
**three** 10:7 16:5
  41:8,23 50:25
  66:1,3,4,7 98:4
**ticket** 76:13 83:24
  92:15 96:5
**time** 5:7 7:8 9:16
  11:25 14:1 17:18
  17:21 18:8,12
  20:15 25:23 26:8
  30:8,25 31:4,12
  31:18,24 32:15,17
  32:19 34:3,21
  36:8,9,18 37:3,23

37:23 38:3,10,12
  45:14,16,19 46:6
  46:21 47:19 48:1
  48:18,21 49:1
  50:4 51:4,11
  53:12 57:17 58:10
  61:6,16 65:11,16
  65:25 67:15 68:20
  69:2,16,17 70:5
  71:3,15,19,20
  72:14,15,16 75:14
  76:20 77:11 78:9
  79:3 82:1 85:2
  88:24 91:16,18
  95:18 98:11,21,25
  99:24 100:12
**timeandahalf**
  51:19
**timecard** 3:22 97:7
  97:10
**timekeeping** 30:24
  31:10
**times** 7:13 24:20
  25:7 34:11 37:21
  38:1,23 39:13,15
  44:6,19 48:11,14
  49:16,17,20 54:17
  55:13 61:24 67:18
  73:4 79:1 80:3
  100:17
**title** 14:9
**titled** 97:10
**today** 5:19 18:8
  26:10 28:2 29:14
  33:7 83:2
**told** 15:6 29:1
  31:13 39:25 46:18
  47:25 50:5,13,23
  54:16,20,25 55:18
  55:19 61:18 62:13
  68:17 69:8 77:8
  84:13,16,18,20
  86:14 91:3 92:6
  92:16 93:16
**tone** 50:15,16 74:6

**tools** 12:18
**top** 67:9 90:22
**topic** 40:9
**topped** 86:18
**total** 44:3 78:13,17
**totaling** 50:21
**totals** 3:21 90:8,10
**touch** 12:4
**track** 31:4
**tracking** 69:2
**trades** 10:23
**traffic** 56:15 83:16
  83:18 95:17,22,25
**trailer** 8:16
**transcript** 6:24
  102:18
**transpired** 64:10
**traveled** 32:15
  95:19
**travels** 60:9
**treated** 36:15
**trial** 5:7 6:25
**tried** 22:16 32:7
  41:20 61:3 97:2
**trouble** 6:20
**truck** 17:21 37:24
  43:3 44:1,24 62:7
  69:3 85:9
**trucks** 12:19 56:13
**true** 24:5 34:13
  102:4
**try** 6:7,14,18 44:4
  61:18
**trying** 13:13 39:6,7
  42:19 54:19 56:12
  57:3 58:11 59:6,8
  65:11
**tuesday** 99:6
**turkey** 78:11 82:2
**turn** 24:8
**turned** 49:3 64:19
**turning** 61:7 99:19
**turnpike** 29:25
  58:8 83:6 96:10
**twice** 37:1 49:18

**twisted** 88:14
**two** 13:16 21:18
  24:23 25:22 33:24
  37:19 41:8 44:19
  64:19 67:18 86:11
  87:14 88:5
**twothirds** 83:7
**type** 10:15 51:9
  93:10,22

### U

**uhhuh** 22:10
**unauthorized**
  34:10 41:4 63:1
  63:10 68:22
**understand** 6:4
  13:13 21:21 28:1
  28:24 42:15 47:20
  50:21 59:14 61:9
  74:18 87:1
**unemployment**
  87:16 88:7 89:13
  92:5,6,9,19,21
  93:2,7
**unfair** 64:2
**unhappiness** 60:6
  60:21
**unhappy** 61:13
**united** 1:1
**unloading** 17:21
**unnecessary** 61:25
**unreasonable**
  46:14
**unsigned** 72:19
**unspoken** 42:12,14
  43:12
**upcoming** 95:6
**updates** 90:21
**upper** 23:20 88:14
  88:20
**uptown** 71:25
**use** 31:15 49:10
  65:4 91:9
**useless** 72:20
**usually** 38:20 54:9
  65:16 79:2 100:17



**V**

vacant 91:6
vaguely 29:19
van 86:23
various 42:22
vehicle 41:6 67:1
  67:16 84:25 85:4
  85:5,6,9,11,14
  87:11,12 92:17
vehicles 76:17 77:6
  101:10,12
verbal 34:4,6 40:25
  41:12 42:23 66:5
  66:6,8 77:20
verbally 6:15 22:18
  38:13 41:2 49:22
view 20:12 32:9
  51:6 94:15,23
  95:1
viewrollup 3:21
  90:7,10
violating 34:18
violation 92:14
violations 76:11
  83:8
vs 1:9

**W**

wage 93:20
wages 51:21
wait 84:2
waived 5:5
walk 61:7 88:25
walked 72:18 82:4
  91:8
walking 36:12
wallet 50:5 71:24
want 6:3 7:1 27:23
  43:21 49:10 50:22
  51:19 57:18 62:15
  84:15 90:20
wanted 38:10,17
  42:9 51:17 63:17
  88:24
warehouse 9:3

43:20 44:5,11,14
44:17 45:10,22
55:22,24 66:12
warehousing 9:14
warned 38:13 41:2
  49:22 62:24,25
  73:16 77:20 79:8
  79:15 80:13
warning 3:13,14,15
  3:16,18,19 34:5,6
  41:3 63:23 64:7
  64:12 66:20,23
  68:11 72:6,10,11
  73:11,15 76:3,6
  77:15,18 78:3
  79:18 81:7
warnings 41:13,13
  42:23 66:2,5
wasnt 14:9 15:24
  20:3 33:6 35:6
  36:19 37:12,22
  39:6 40:11 45:14
  53:21 54:5,15
  56:11,11 57:1
  61:5,24 63:9 68:2
  69:6 70:9 71:15
  82:3 83:24 84:3,8
  84:10,23 86:5
  92:24
way 18:23 30:14
  32:3,25 37:17
  43:5 50:1,3,7,21
  50:24 51:1 67:19
  69:5,15 78:15,19
  79:5,6,7 83:8
  88:14 93:11 94:15
  96:4 98:10
website 31:6 91:23
  92:4 93:5,8,21
week 16:14 24:20
  25:1 33:11 37:19
  49:14,17,18 79:1
weeks 24:23 86:11
  87:14 88:5
went 9:6 70:25 71:3

84:25 85:11 88:13
88:15,17 93:18
weve 87:5
whats 6:16 8:1 22:8
  23:9 27:15 32:9
  51:24 59:22 60:12
  61:4 63:23 65:8
  67:13 82:22
witness 4:4 18:9,14
  22:9 25:21 27:14
  60:13 89:6 102:3
  102:5
wondering 42:21
wood 1:17 2:9
word 42:2 91:4
wordforword
  20:24 39:25 43:10
words 82:6 86:15
  86:19
work 8:23 9:4,12
  11:14 13:19,20
  14:9 16:9 33:8,12
  37:24 44:1 46:1
  56:14 61:6,7,8
  85:8 89:22 91:2
  100:18
workday 41:4 67:2
  67:15
worked 10:12 12:9
  13:3 24:25 30:25
  33:11 35:7 37:6
  38:2,25 48:19
  53:14
working 13:16
  16:13 17:6 22:3
  43:3 51:20 52:19
  53:22 54:6,21
  68:20
works 63:20
worried 51:18
worry 58:10
wouldnt 10:24
  32:18 47:12 81:11
  100:3
write 20:17 29:5

writeup 30:6 51:9
  74:25 77:6 79:19
  80:5
writeups 77:4
written 3:13,14,15
  3:16,18,19 26:16
  30:15 34:17,20
  40:25 41:3,13
  49:21,23 50:19,22
  63:21,25,25 64:1
  64:7,11 66:1,5,5,6
  66:20 69:9 72:6
  72:10 73:11,15
  76:2,6 77:4,14,18
  80:22 81:13 85:24
wrong 54:21 88:14
wrote 56:21
www 1:24

**X**

x 3:1,6

**Y**

yeah 9:10 10:9
  11:11 12:8,11,22
  13:24 14:5,20
  15:16,24 16:10
  17:2 18:2,12,21
  20:7,16 21:7,13
  23:21 25:2,3,6
  31:5 32:1 33:17
  34:3,15 36:23
  37:3,11 39:1,11
  40:4 43:14,22
  45:18 46:6 49:15
  49:16,16 50:9
  51:10 55:1 56:8
  56:10,19 57:10,14
  58:22,23 59:21,23
  61:24 62:5,22
  63:22 66:7,7 68:9
  69:12 70:23 71:6
  73:4,7,25 74:7
  75:6,13 76:12
  77:3 78:4 79:11
  79:19 81:9 82:8

83:3,12 87:3,9
  90:25 92:2,22
  95:7,12 96:9,21
  96:24 97:1,21
  98:2,3,14 99:2
  100:1,14
year 7:8 8:22 9:17
  9:21 35:11 52:4,5
  87:18,19
years 10:12,14 91:5
youd 13:22 71:8
young 101:2
youre 6:10,18 7:3,5
  7:20 10:22 23:23
  25:7 26:1,5 27:12
  28:2,7 31:14 33:8
  33:15 36:13 39:24
  40:25 43:3,3
  49:23 54:5 59:7
  59:10 61:13 65:14
  69:2,9 92:12,16
  96:1,7
youve 6:1 18:7,18
  19:7 25:19 29:14
yup 60:14

**Z**

**0**

000 23:10,11,11
05 13:18
08003 2:4
08830 1:18 2:10

**1**

1 1:3 3:13 64:8,12
  101:18
10 1:18 2:4 3:18
  10:14 23:11 44:3
  44:8 62:7 69:18
  76:3 83:15
100 41:11 55:12
10minute 69:21
11 3:13,14,15,19
  64:8,12 66:21
  72:7 77:15 82:25



**12** 3:15,16,18,19
  72:7 73:12 76:3
  77:15 99:6 100:21
**125** 88:25
**13cv05220rmba...**
  1:3
**14** 30:23
**15** 23:18,18 50:21
  53:18 99:19
**15minute** 41:21
**16** 30:20
**17** 1:14 23:18
**18** 3:8 73:17
**1878** 2:3
**1981** 8:2

**2**

**2** 97:11
**20** 16:13 34:24
  44:18 49:4,25
  53:18 56:16 60:19
  82:16
**2000** 8:11 9:18
**2001** 9:18
**2002** 13:15
**2010** 11:10 13:15
  97:11 98:13
**2011** 65:13 72:11
  73:17 99:6
**2012** 73:15 74:16
  74:16 76:6 77:19
  77:20,23 78:1
  79:9 99:20 100:10
  100:21
**2013** 82:25 97:11
**2014** 1:14
**22** 3:16 73:12,15
**23** 77:23 97:11
  100:9
**24** 77:20 79:9
  100:21
**25** 3:11 34:16
  100:20
**27** 74:16 85:7 97:11
  99:4
**28** 78:1

**29** 3:12,19 74:16
  77:15,18
**295** 96:11

**3**

**3** 3:18 76:3,6
**30** 1:18 3:14 21:8
  31:14 34:1,24,25
  38:18 49:11 56:16
  61:17,19 66:21
  78:18
**30minute** 31:25
  32:16 98:17
**31** 3:13 64:8,12

**4**

**4** 97:11 99:6
**40** 24:21 33:12
  53:20 101:18
**45** 25:1,2

**5**

**5** 3:4,16 73:12
**50** 17:5 25:1
**52** 24:10
**5495600** 2:10
**5th** 1:17 2:9

**6**

**6** 3:14 66:21 99:20
  100:10
**6246221** 1:24
**64** 3:13
**65** 96:12,16
**66** 3:14
**6857420** 2:5

**7**

**7** 23:10,11
**70** 76:18 96:9,13,18
**72** 3:15
**73** 3:16
**732** 2:10
**74** 3:17
**75** 34:15
**76** 3:18

**77** 3:19
**7eleven** 70:5 78:15
**7th** 8:2

**8**

**8** 3:15 72:7,11
**82** 3:20
**856** 2:5
**866** 1:24

**9**

**9** 76:5
**90** 3:21
**91** 76:22 96:4
**97** 3:22
**99** 1:17 2:9

